383 A.2d 155

**COMMONWEALTH of Pennsylvania**

v.

**Stanton STORY, Appellant.**

Supreme Court of Pennsylvania.

Argued April 19, 1977.

Decided Jan. 26, 1978.

Paul R. Gettleman, Welsh S. White, Leonard I. Sharon, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

### OPINION OF THE COURT

ROBERTS, Justice.

On July 3, 1974, Patrick Wallace, a Pittsburgh police officer, was shot and killed. Appellant, Stanton Story, was later arrested and charged with the murder. After a jury trial, he was found guilty of murder of the first degree. Post-verdict motions were denied and a sentence of death was imposed.[1]

In this appeal,[2] appellant contends he was denied a fair trial because the trial court permitted the Commonwealth to introduce irrelevant and prejudicial evidence concerning the victim's family life and professional reputation. We agree,[3] reverse judgment of sentence and grant appellant a new trial.[4]

1. The death sentence was imposed pursuant to 18 Pa.C.S.A. § 1102 (1973) and 18 Pa.C.S.A. § 1311 (Supp.1977).

2. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1977).

3. Because we reverse on this ground, we need not address appellant's remaining claims that: (1) the trial court erred in refusing to grant a motion for a change of venue; (2) the trial court erred in disclosing to the prosecution, before trial, defense counsel's offer concerning the expected testimony of a defense witness; (3) the trial court erred in admitting into evidence three guns which were found in appellant's possession at the time of his arrest two months after the shooting; (4) the trial court erred in refusing to allow appellant to testify concerning his fear of the police; (5) the trial court erred in refusing to permit appellant to examine a defense witness concerning inducements offered by the prosecution if the witness testified against appellant; (6) the trial court made prejudicial remarks in its charge to the jury; (7) the trial court erred in excluding the testimony of a proferred defense witness; (8) the death penalty should be vacated because veniremen were improperly excluded for cause even though it was not clear that they would automatically vote against the imposition of capital punishment; (9) the voir dire procedure was insufficient to ensure a competent, fair, and impartial jury; (10) the death penalty should be vacated because (a) its imposition in this case would violate *Jackson v. United States*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); (b) the penalty statute violates the eighth and fourteenth amendments of the United States Constitution

I

A.

█ At trial, the Commonwealth called Marilyn Wallace, the victim's widow, as its second witness. After appellant sought an offer of proof, the Commonwealth stated that it was calling Marilyn Wallace for the purpose of (1) introducing photographs of the victim and his daughter which Marilyn Wallace had taken when the family was on vacation; (2) describing the victim's family status; (3) relating that Marilyn Wallace had last seen her husband alive on the morning that he was killed; and (4) presenting other events of a personal nature. Appellant objected to the proposed testimony on the ground that it was irrelevant and highly prejudicial. The trial court overruled the objection and permitted Marilyn Wallace to testify.

Marilyn Wallace testified that she married the victim on January 22, 1966, and that they had a six year old daughter named Jennifer Ann, who attended school at the home for crippled children. She further testified that she was employed by the county police. Only after her husband's death did she begin working. She stated that her husband had been employed as a police officer for five years, that he was in the armed forces reserves and was attending college at the time of his death. Marilyn Wallace also testified that she last saw her husband alive on the morning that he was

because it does not permit the jury to consider an adequate range of mitigating circumstances; (c) the death penalty statute allocates the burden of proof in a manner which violates due process; and (d) the trial court erred in charging the jury at the penalty stage that appellant was of age.

4. Appellant does not contend that the evidence is insufficient to support the verdict of murder of the first degree. However, this Court has an independent obligation to determine whether the evidence is sufficient to support a verdict of murder of the first degree. Act of February 15, 1870, P.L. 15, § 2, 19 P.S. § 1187 (1964). An examination of the record reveals that the evidence is sufficient to support the verdict.

killed[5] and that she was notified of his death at about noon. She then identified two photographs of the victim with their daughter which she had taken when the family was on vacation in Canada. The photographs were admitted into evidence over objection and shown to the jury.

Appellant argues that Marilyn Wallace's testimony and the two photographs of the victim with his daughter were irrelevant and prejudicial. Appellant asserts that the evidence that the victim left a widow and a handicapped daughter, and that his widow was forced to work after her husband's death, created sympathy for the victim and his family and inflamed the jury.[6]

5. Appellant argues that it was error for the trial court to permit Marilyn Wallace to testify that she had last seen her husband alive on the morning that he was killed. Appellant contends that this testimony was irrelevant because the Commonwealth had other witnesses who could testify that the victim was alive on the morning of July 3, 1974. Appellant asserts that even if this testimony was relevant, its prejudice outweighed its probativeness. Compare *Commonwealth v. Gaddy,* 468 Pa. 303, 362 A.2d 217 (1976) (plurality opinion) and *Commonwealth v. Evans,* 465 Pa. 12, 348 A.2d 92 (1975) with *Ashmore v. State,* 214 So.2d 67 (Fla.App.1968). Because we conclude that the photographs of the victim and his daughter and the testimony of Marilyn Wallace concerning the victim's family status and personal life were erroneously admitted into evidence, we need not reach appellant's claim that Marilyn Wallace's testimony that she last saw her husband alive on the morning that he was killed was improperly admitted into evidence.

6. Appellant contends that the evidence that the victim's daughter was handicapped exacerbated the prejudicial nature of the evidence of the victim's family status. The Commonwealth argues that appellant cannot claim that he was prejudiced by the testimony that the victim's daughter attended school at the home for crippled children because on voir dire appellant asked the veniremen whether they or their families had contributed to the Jennifer Wallace Fund, which was set up after the victim's death to help support his daughter. The Commonwealth fails to note that all the veniremen who became part of the jury stated that they or their families had not contributed to the fund. Moreover, the question on voir dire inquired only whether the jurors had contributed to the Jennifer Wallace Fund. The question did not reveal that Jennifer Wallace was handicapped. Marilyn Wallace's testimony was the only evidence which indicated that Jennifer was handicapped.

Appellant asserts that the photographs of the victim with his daughter on a beach accentuated the prejudice created by the testimony concerning the victim's family life. The Commonwealth con-

In *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976), Mr. Justice Nix, writing for a majority of this Court, articulated the threshold inquiry in determining whether evidence is properly admitted into evidence.

"Any analysis of the admissibility of a particular type of evidence must start with a threshold inquiry as to its relevance and probative value. *Commonwealth v. Jones*, 459 Pa. 62, 66, 327 A.2d 10, 13 (1974); *Commonwealth v. McCusker*, 448 Pa. 382, 388, 292 A.2d 286, 289 (1972). We have cited with approval the test for relevance propounded by two leading evidentiary authorities, Wigmore and McCormick. *Commonwealth v. Jones*, supra; *Commonwealth v. Lippert*, 454 Pa. 381, 384, 311 A.2d 586, 587 (1973); *Commonwealth v. McCusker*, supra. Wigmore defines relevance in terms of two axioms, 'None but facts having rational probative value are admissible,' and 'All facts having rational probative value are admissible, unless some specific rule forbids.' 1 Wigmore, Evidence, § 9–10 at 289–95 (3rd Ed. 1940). McCormick suggests the following for determining relevance, '. . . [d]oes the evidence offered render the desired inference more probable than it would be without the evidence? . . . Relevant evidence then, is evidence that in some degree advances the inquiry, and thus has probative value, and is prima facie admissible.' McCormick, Evidence § 185 at 437–38 (2nd Ed. 1972)."
Id. 468 Pa. at 218, 360 A.2d at 918.

tends that the photographs did not prejudice appellant because the photographs did not reveal that Jennifer was handicapped. The Commonwealth misses the point. The photographs of the victim with his daughter were irrelevant and prejudicial regardless whether they revealed that Jennifer was handicapped. The photographs of the victim-father with his daughter vacationing on a beach had no place in appellant's trial. Moreover, the Commonwealth is incorrect in its contention that the photographs did not accentuate the testimony which revealed that Jennifer was handicapped. Although the record does support the Commonwealth's contention that the photographs do not indicate that Jennifer was handicapped, the photographs do accentuate the prejudice to the accused, for the jurors could apply their awareness of Jennifer's condition to the photographs. Thus, we believe that the photographs exacerbated the prejudicial nature of Marilyn Wallace's testimony.

Here, Mrs. Wallace's testimony concerning her husband's family status and personal life, and her description of the photographs of her husband with his child have no "rational probative value" to the issue whether appellant feloniously killed Patrick Wallace. Rather, this evidence injected extraneous considerations into the case and prejudiced appellant by creating sympathy for the victim and his family.

In its offer of proof, the Commonwealth stated that it thought that the jury was "entitled to know this man was married, he was a father, he in fact was a family man." The prosecutor further stated that the victim "is more than a body" and that the prosecutor wanted the jury "to get some feel for this activity of his life." It is evident that the Commonwealth explicitly sought to create sympathy for the victim and his family and to inflame the jury against appellant. We condemn such trial tactics. As the Illinois Supreme Court has observed:

> "[The] defendant, no matter how reprehensible his crime, was entitled to have jurors consider both the matter of his guilt and punishment, uninfluenced by the circumstance that decedent's widow had been left alone with children of tender ages as the result of the homicide."
>
> *People v. Bernette,* 30 Ill.2d 359, 372, 197 N.E.2d 436, 444 (1964).

The Commonwealth relies on *Commonwealth v. Ross,* 413 Pa. 35, 195 A.2d 81 (1963), to argue that Marilyn Wallace's testimony and the photographs of the victim on vacation with his daughter on a beach were relevant to demonstrate "the natural development of the facts of the case." *Ross* provides no support for the Commonwealth's position. Ross was charged with the murder of a woman with whom he once resided. The woman's son was murdered at the same time. The Commonwealth called a pathologist to testify that he had performed an autopsy on the son and that the son had died from a gunshot wound. The defendant contended that it was prejudicial error to permit any testimony that the son died as a result of the shooting. In affirming the admission of this evidence, this Court noted that, ordinarily, evidence of the commission of a crime other than the

one for which the defendant is being tried is not admissible. We stated that an exception to this rule is recognized where the criminal or bad act is used to show " 'intent, scienter, motive, identity, plan or the accused to be one of an organization banded together to commit crimes of the sort charged, or that such prior conviction or criminal act formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or *was part of the natural development of the facts* . . . .' " Id. at 40, 195 A.2d at 83; quoting *Commonwealth v. Williams*, 307 Pa. 134, 148, 160 A. 602, 607 (1932) (emphasis altered).

The principle enunciated in *Ross* is designed to give the trier of fact background information when such information is necessary to understand the criminal episode which forms the basis of the charges against the accused. Here, evidence of the victim's family life and the photographs of the victim with his daughter shed absolutely no light on the criminal episode which resulted in Patrick Wallace's death. This evidence had no relevance to "the natural development of the facts" of this case.

Other jurisdictions which have addressed the issue whether evidence of a murder victim's family status is probative have held that such evidence is irrelevant and prejudicial to the accused. See *Knight v. State*, 273 Ala. 480, 142 So.2d 899 (1962); *Walker v. State*, 239 Ark. 172, 388 S.W.2d 13 (1965); *Foster v. State*, 266 So.2d 97 (Fla.Dist.Ct.App.1972); *Wolfe v. State*, 202 So.2d 133 (Fla.App.), appeal dismissed, 207 So.2d 457 (Fla.1967); *People v. Bernette*, 30 Ill.2d 359, 197 N.E.2d 436 (1964); *People v. Miller*, 6 N.Y.2d 152, 188 N.Y.S.2d 534, 160 N.E.2d 74 (1959).

In *People v. Miller*, supra, the brother of the murder victim testified concerning his identification of the victim at the morgue. He was asked whether the victim had a wife and children. The New York Court of Appeals held that it was prejudicial error to permit testimony that the victim had a wife and seven children, for such evidence had "no bearing on the materiality of the issues before the jury, [and] was calculated to appeal to the passion and sympathy

of the jury . . . ." The court concluded that "[t]here could be no purpose to this line of testimony but to conjure up in the minds of the jurors undue prejudice against the defendant." Id. at 157, 188 N.Y.S.2d at 539, 160 N.E.2d at 77.

The Illinois Supreme Court held that the admission into evidence of the victim's family status was reversible error in *People v. Bernette*, supra. The court stated:

"A defendant's guilt must be established by legal and competent evidence, uninfluenced by bias and prejudice raised by irrelevant evidence and, in such connection this court has consistently condemned the admission of evidence that the deceased left a spouse and a family, inasmuch as such evidence has no relationship to the guilt or innocence of the accused or the punishment to be inflicted upon him, but serves ordinarily only to prejudice him in the eyes of the jury. . . ."

30 Ill. at 371, 197 N.E.2d at 443 (citations omitted).

In *Knight v. State*, supra, the Alabama Supreme Court observed:

"How many children the slain man had, their ages . . are irrelevant facts . . . . [T]o hold such evidence not prejudicial to the defendant is to disregard the realities of trial atmosphere and the emotional frailties of human nature."

273 Ala. at 491, 142 So.2d at 910.[7]

7. In *Walker v. State*, 239 Ark. 172, 388 So.2d 13 (1965), the Arkansas Supreme Court held that it was error to admit evidence of the homicide victim's family status. In *Walker*, the victim's wife testified that she had been married to the victim for twelve years and that they had two children, a girl of eight and a boy of sixteen months. She also testified that the victim had been a wonderful husband. The court observed that "[h]ow many children [the victim] had, their ages, whether he was a kind and loving husband . . . and any matter relating to his good character are irrelevant facts in this case." Id. at 182, 388 S.W.2d at 18.

In *Wolfe v. State*, 202 So.2d 133 (Fla.App.), appeal dismissed, 207 So.2d 457 (Fla.1967), the court noted that "[e]vidence of the victim's family status is normally inadmissible in a homicide prosecution. . . . Standing alone, such evidence is irrelevant, immaterial and highly prejudicial . . . ." Accord, *Foster v. State*, 266 So.2d 97 (Fla.App.1972) (dictum).

 Ordinarily, in determining whether evidence is admissible at trial, the trial court must balance the probativeness of the evidence against its prejudicial impact. *Commonwealth v. Ulatoski*, 472 Pa. 53, 63 n.11, 371 A.2d 186, 191 n.11 (1977); J. McCormick, Evidence § 185, at 438–40 (2d ed. 1972). In this case, however, the evidence in question was totally irrelevant to the determination of appellant's guilt or innocence. It was therefore unnecessary for the trial court to determine whether the probativeness outweighed the prejudice. See *Commonwealth v. Fell*, 453 Pa. 531, 309 A.2d 417 (1973). We hold that the trial court erred in permitting the Commonwealth to present Marilyn Wallace's testimony and the photographs of the victim with his daughter. See 1 Wharton's Criminal Evidence § 164, at 304 (13th ed. 1972) ("Evidence which has the effect of inspiring sympathy for the . . . victim of the crime is prejudicial and inadmissible when otherwise irrelevant. Thus, in a prosecution for murder, it is not permissible to show that the victim had a family or a specific number of children . . .").

### B.

 Appellant asserts that the Commonwealth continued its strategy of inflaming the jury against appellant when it presented evidence, in its case in chief, concerning the victim's professional reputation.[8] Appellant contends

---

**8.** The Commonwealth argues that appellant's objection to the question concerning the victim's professional reputation had been sustained. The record indicates, however, that the objection was overruled. During Officer Scanlan's direct examination, the following occurred:

"[Mr. Geary, the prosecutor]
Q. Was Officer Wallace well thought of in the community?
MR. GETTLEMAN [Defense counsel]: Object to that. Irrelevant.
THE COURT: I didn't get the question.
Q. I asked you, sir, was he well thought of in the community which you patrolled?
A. [Officer Scanlan] Yes he was.
Q. Was he respected by that community?
MR. GETTLEMAN: I object to that and wish you would instruct—
THE COURT: I didn't hear the question, and I want the question asked.

that it was improper for the Commonwealth to present evidence of the victim's reputation since appellant neither attacked the victim's reputation nor asserted that the killing was justified because the victim was the aggressor. We agree.

It is well established that the Commonwealth cannot offer evidence of the victim's reputation unless and until the victim's reputation is put in issue by the defense. *Commonwealth v. Castellana*, 277 Pa. 117, 121 A. 50 (1923), cited with approval in *Commonwealth v. Donovan*, 447 Pa. 450, 291 A.2d 116 (1972) (dictum); *Walker v. State*, supra; J. McCormick, Evidence § 193, at 461 (2d ed. 1972); 1 Wharton's Criminal Evidence § 236 (13th ed. 1972); 1 A.L.R.3d 571 (1965). Here, appellant did not attack the victim's reputation, and such evidence was therefore irrelevant to the issues before the jury.

The facts of this case are strikingly similar to those of *Walker v. State*, supra. In *Walker*, the defendant was

MR. GETTLEMAN: Would you please instruct the witness not to answer before you rule, please.
BY THE COURT:
Q. If you hear an objection, don't answer the question until the objection has been ruled on.
A. Yes, sir.
BY MR. GEARY:
Q. My question was, Officer, in the area in which you worked for two and a half years with Patrick Wallace was he respected in that Community by the people that you worked with?
MR. GETTLEMAN: Object.
THE COURT: *The objection is overruled.*
A. Yes, he was.
Q. Was he liked by the community?
MR. GETTLEMAN: Objection.
He can't tell whether people liked him.
THE COURT: Yes, I think that is true."
(emphasis added).

Thus, the record does not support a finding that the trial court sustained appellant's objection to the question concerning whether the victim was respected in the community in which he worked. The court did sustain an objection to a question whether the victim was well liked. However, this ruling apparently was based on the form of the question not the admissibility of reputation evidence. By ·the time this objection was sustained, the witness had already stated twice that Wallace was well respected in the community which he patrolled. The jury was never informed that this testimony was irrelevant or instructed to disregard it.

accused of killing a police officer. The prosecution, in its case in chief, presented testimony by the chief of police that the victim was "a very efficient officer, well liked, and did his work without any complaints." 239 Ark. at 181, 388 S.W.2d at 18. The chief of police also testified that the victim had received an award from a civic club for courtesy. The Arkansas Supreme Court held that the admission of such testimony was error.

> "This evidence was introduced by the State before the accused had offered any testimony. The accused had not attacked the fact that this young police officer was a man of good reputation. Our court has held . . . that such evidence offered by the prosecution should not be admitted until the accused has undertaken to attack the character of the deceased in that respect. . . .
>
> . . . [The victim's] efficiency on the police force, and any matters relating to his good character are irrelevant facts in this case."

Id. at 182, 388 S.W.2d at 18.

We believe the result in *Walker* is sound. Just as the evidence that the victim left a widow and child bears no relationship to the determination of guilt or innocence, so too the evidence that the victim was well respected by the people in the community in which he worked has no bearing on appellant's guilt or innocence. The evidence of the victim's reputation created sympathy for the victim and inflamed the jury. We hold that the trial court erred in admitting evidence of the victim's professional reputation.

## II

The Commonwealth contends that any error in the admission of the testimony of Marilyn Wallace and Officer Scanlon, as well as the photographs of the victim with his daughter, was harmless. We do not agree.

### A.

1. Our inquiry must begin with the determination of the proper standard of proof to be employed in resolving whether a non-constitutional error in a criminal prosecution is harmless.

 Where a trial error violates the federal constitution, this Court, at a minimum, must employ the federal harmless error rule. See *Chapman v. California,* 386 U.S. 18, 21, 87 S.Ct. 824, 826–27, 17 L.Ed.2d 705 (1967). A federal constitutional error cannot be found harmless unless an appellate court is convinced beyond a reasonable doubt that the error was harmless. Id. Where the trial error arises under state law, however, the proper standard for determining whether such an error is harmless is a question of state law.

 Although this Court has previously held that an error involving state law may be harmless, our cases have not articulated a consistent standard for determining whether an error is harmless.[9] In order to eliminate any confusion which may exist,[10] we hold that the proper standard for determining whether an error involving state law is harmless is the same as the standard this Court applies to federal constitutional error: an error can be harmless only if the

9. Our cases have articulated the standard of harmless error in different ways. See, e. g., *Commonwealth v. Martinolich,* 456 Pa. 136, 160 n.15, 318 A.2d 680, 693 n.15, cert. denied, 419 U.S. 1065, 42 L.Ed.2d 661, 95 S.Ct. 651 (1974) (error harmless if harmless beyond a reasonable doubt); *Commonwealth v. Davis,* 455 Pa. 466, 467, 317 A.2d 218, 218 (1974) (per curiam) (same); *Commonwealth v. Canales,* 454 Pa. 422, 428, 311 A.2d 572, 575 (1973) (error not harmless in case where erroneously admitted evidence corroborated testimony "critical to the prosecution" and disputed by the defendant); *Commonwealth v. Ravenell,* 448 Pa. 162, 292 A.2d 365 (1972) (error harmless where erroneously admitted evidence did not have any influence on the verdict and did not prejudice the right of the defendant to a fair trial); *Commonwealth v. Fell,* 453 Pa. 531, 309 A.2d 417 (1973) (error harmless where improperly admitted evidence cumulative and did not prejudice the right of the defendant to a fair trial); *Commonwealth v. Lippert,* 454 Pa. 381, 311 A.2d 586 (1973) (error not harmless if improperly admitted evidence not merely cumulative); *Commonwealth v. Settles,* 442 Pa. 159, 162, 275 A.2d 61, 63 (1969) (error harmless if it "could [not] possibly have affected the jury in reaching its verdict").

10. Commentators have criticized the confusion and lack of uniformity in the articulation and application of harmless error rules. See, e. g., R. Traynor, The Riddle of Harmless Error (1970); Saltzburg, The Harm of Harmless Error, 59 Va.L.Rev. 988 (1973).

appellate court is convinced beyond a reasonable doubt that the error is harmless.[11]

▮ Several considerations persuade us that the "beyond a reasonable doubt" standard is the proper standard to apply in determining the harmlessness of *any* criminal trial error. First, this standard is commensurate with the standard of proof in criminal trials—that an accused cannot be convicted unless the trier of fact is convinced beyond a reasonable doubt that the accused is guilty as charged. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In order to maintain the integrity of this standard, appellate courts should utilize a comparable standard in determining whether an error was harmless. Professor Saltzburg has observed:

"It would make little sense to adopt the *Winship* standard, which is designed to prevent criminal convictions if there is even a reasonable doubt in the minds of jurors as to the guilt of the person charged, and then on appeal to emasculate that evidentiary standard when the trial court has violated evidentiary rules which might have influenced the jury by creating the requisite doubt. . . . [C]onvictions must be reversed where the appellate court cannot arrive at a conclusion about the impact of an error on the jury verdict with the same degree of certainty demanded at trial."

Saltzburg, The Harm of Harmless Error, 59 Va.L.Rev. 988, 992 (1973) (footnote omitted).[12]

Second, there are sound reasons for applying the same standard for determining harmless error whether the error

11. In addition, the burden of establishing that the error was harmless beyond a reasonable doubt rests with the Commonwealth. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Fontaine v. California,* 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968); *Commonwealth v. Davis,* 452 Pa. 171, 305 A.2d 715 (1973).

12. Accord, *Commonwealth v. Davis,* 452 Pa. 171, 177, 305 A.2d 715, 719 (1973) (citations omitted):

"This reasonable doubt standard reflects a fundamental belief that once . . . error has been established, it is far worse to conclude incorrectly that the error was harmless than it is to conclude incorrectly that the error was reversible."

violates state or federal law. State rules often implicate constitutional values, and the violation of a state rule may rise to the level of a federal constitutional violation. The protection of constitutional rights, as well as the development of a coherent doctrine of harmless error, militate in favor of the application of the same standard for constitutional and non-constitutional errors. Because it may be unclear whether a well established state rule is also constitutionally mandated,[13] separate harmless error standards might prove to be unworkable. Moreover, a more relaxed harmless error standard for errors perceived as violations of state rules, but which might also be violations of the federal Constitution, would leave constitutional values inadequately protected.

Third, it is irrelevant whether an error is constitutional or non-constitutional in determining whether the error is prejudicial to the accused. Constitutional errors are not inherently more injurious to an accused than errors under state law.[14] There is no reason why a state court

13. For example, while the confrontation clause is not simply a codification of the hearsay rule, *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1932, 26 L.Ed.2d 489 (1970), the hearsay rule and the confrontation clause have similar underpinnings and the confrontation clause may often bar admission of evidence in violation of the hearsay rule. J. McCormick, Evidence § 252 (2d ed. 1972). Similarly, our cases recognize the right of a criminal defendant to present relevant evidence. E. g., *Commonwealth v. Boyle*, 470 Pa. 343, 368 A.2d 661 (1977). At some point, denial of this right amounts to a denial of due process. See *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1972).

14. "Consider, for instance, the introduction into evidence of a confession or admission which was illegally obtained. The evidence is dangerous because it is likely to carry great weight with the jury. But from the defendant's standpoint, it makes no difference whether an adverse jury verdict, based on the confession, is reversed upon the grounds that the illegal statement violates the federal rule of *Miranda v. Arizona*, [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694 (1966)] or a state rule regarding tacit admissions. Regardless of legal theory, the harm prevented is precisely the same . . . . It is the impact of the error upon the defendant's trial which should primarily concern the courts, not whether the error can be labelled constitutional or non-constitutional."

should apply a stricter harmless error standard to federal constitutional rules than to state rules, especially since the purpose of most state rules is to assure a fair trial.[15]

Finally, there is the danger that a lenient harmless error rule may denigrate the interests and policies which both constitutional and non-constitutional rules promote. We are convinced that the "beyond a reasonable doubt" standard reaches the proper balance of competing considerations implicated in the harmless error rule. The harmless error rule derives from the notion that although an accused is entitled to a fair trial, he is not entitled to a perfect one. Thompson, Unconstitutional Search and Seizure and the Myth of Harmless Error, 42 Notre Dame Lawyer 457 (1967). The harmless error rule can save the time, effort and expense of unnecessary retrials where the defendant has not been prejudiced by an error. Id. But courts must be careful in applying the harmless error rule, for if the violation of a rule is too readily held harmless, the importance and effectiveness of

Saltzburg, The Harm of Harmless Error, 59 Va.L.Rev. 988, 1025 (1973) (footnotes omitted). Accord, R. Traynor, The Riddle of Harmless Error 47–49 (1970); *Fahy v. Connecticut,* 375 U.S. 85, 94, 84 S.Ct. 229, 234, 11 L.Ed.2d 171 (1963) (dissenting opinion of Harlan, J., joined by Clark, Stewart and White, JJ.):

> "It is obvious that there is no necessary connection between the fact that evidence was unconstitutionally seized and the degree of harm caused by its admission. The question of harmless error turns not on the reasons for inadmissibility but on the effect on the evidence in the context of a particular case. Erroneously admitted 'constitutional' evidence may often be more prejudicial than erroneously admitted 'unconstitutional' evidence."

**15.** Professor Saltzburg has observed:

> "Although the Constitution may commonly be considered the source of fair judicial procedure, the non-constitutional evidentiary rules may actually be a defendant's primary protection. A state does not design its evidentiary rules in a vacuum; each rule is intended to play a part in guaranteeing a fair trial—by excluding unreliable evidence, by balancing the probative value of certain kind of evidence against the prejudicial effect, by barring extraneous matter, by guiding the jury or judge in proper performance of the decision-making function. Each rule signifies a state policy with respect to fairness, a policy that is applicable to all cases irrespective of the charge and the identity of the defendant."

Saltzburg, The Harm of Harmless Error, 50 Va.L.Rev. 988, 989 (1973).

the rule is denigrated. We believe that the "beyond a reasonable doubt" standard reaches the most reasonable balance between the consideration of judicial economy and the important policies which underlie constitutional and non-constitutional rules.

2. Having articulated the proper standard of proof in determining whether an error is harmless, we must now address the proper definition of harmlessness, for any theory of harmless error must include both the standard of the degree to which an appellate court must be convinced that an error is harmless and the definition of harmlessness. We adopt the standard that an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a " 'reasonable possibility' " that an error " 'might have contributed to the conviction,' " the error is not harmless. *Commonwealth v. Davis,* 452 Pa. at 178, 305 A.2d at 719, quoting *Chapman v. California,* 386 U.S. at 24, 87 S.Ct. at 828.

## B.

The principle that an error is harmless if it did not contribute to the verdict only sets the stage for the harmless error inquiry. As former Chief Justice Traynor has observed:

> "There are countless possible variations of error. There are also countless possible exponential factors that may determine what effect, if any, error in the course of litigation may have upon a judgment."

R. Traynor, The Riddle of Harmless Error 16 (1970). It is therefore hardly surprising that the focus of this Court's inquiry into the impact of trial errors has varied depending upon the circumstances of the case.

In numerous cases, this Court has focused solely on the prejudicial impact of the erroneously admitted evidence, considering other, properly admitted evidence only in rela-

tion to this inquiry.[16] When the record reveals that an error did not prejudice the defendant,[17] or that the prejudice was so minimal that, beyond a reasonable doubt, it did not influence the jury,[18] we have held the error harmless. In

**16.** See generally Field, Assessing the Harmlessness of Federal Constitutional Error—A Process In Need of a Rationale, 125 U.Pa.L.Rev. 15, 16–19, 36–37 n.68 (1976) [hereinafter cited as "Field"].

Although discussions of harmless error usually focus on errors which permit the Commonwealth to introduce evidence, harmless error problems arise with other kinds of errors as well. See, e. g., *Commonwealth v. Maloney*, 469 Pa. 342, 365 A.2d 1237 (1976) (plurality opinion) (improper prosecutorial closing argument); *Commonwealth v. London*, 461 Pa. 566, 337 A.2d 549 (1975) (improper impeachment of Commonwealth's own witness with prior inconsistent statement).

**17.** *Commonwealth v. Moore*, 462 Pa. 231, 340 A.2d 447 (1975) (relying in part on lack of prejudice); *Commonwealth v. London, supra*; *Commonwealth v. Carr*, 459 Pa. 262, 328 A.2d 512 (1974); *Commonwealth v. Craft*, 455 Pa. 616, 317 A.2d 213 (1974); *Commonwealth v. Faison*, 452 Pa. 137, 305 A.2d 44 (1973); *Commonwealth v. Knudsen*, 443 Pa. 412, 278 A.2d 881 (1971); *Commonwealth v. James*, 433 Pa. 508, 253 A.2d 97 (1969); *Commonwealth v. Snyder*, 427 Pa. 83, 233 A.2d 530 (1967).

**18.** *Commonwealth v. Rogers*, 463 Pa. 399, 344 A.2d 892 (1975); *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471 (1972) (relying in part on *de minimis* nature of the error); *Commonwealth v. Camm*, 443 Pa. 253, 277 A.2d 325 (1971) (same), cert. denied, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972); *Commonwealth v. Settles*, 442 Pa. 159, 275 A.2d 61 (1971); *Commonwealth v. Collins*, 440 Pa. 368, 269 A.2d 882 (1970); *Commonwealth v. Padgett*, 428 Pa. 229, 237 A.2d 209 (1969); *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552 (1967) (semble).

One factor to be considered by an appellate court assessing the impact of an error is whether the trial court instructed the jury to disregard the information which was improperly brought to its attention. Adequate cautionary instructions may minimize the impact of an error so as to render it harmless. E. g., *Commonwealth v. Maloney, supra* (dictum); *Commonwealth v. Davenport*, 462 Pa. 543, 342 A.2d 67 (1975); *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680, cert. denied, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974); *Commonwealth v. Thomas*, 459 Pa. 371, 329 A.2d 277 (1974) (plurality opinion). But see *Commonwealth v. Collins*, 462 Pa. 495, 341 A.2d 492 (1975); *Commonwealth v. Russell*, 456 Pa. 559, 322 A.2d 127 (1974); *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971).

other cases, we have reversed because the prejudice was more than *de minimis.*[19]

■ This Court has also examined the properly admitted evidence to determine whether the erroneously admitted evidence was merely cumulative of other, untainted evidence.[20] An error which, viewed by itself, is not minimal, may nonetheless be harmless if properly admitted evidence is substantially similar to the erroneously admitted evidence.[21]

**19.** *Commonwealth v. Heacock,* 467 Pa. 214, 355 A.2d 828 (1976); *Commonwealth v. Harkins,* 459 Pa. 196, 328 A.2d 156 (1974); *Commonwealth v. Russell,* supra; *Commonwealth v. Henderson,* 456 Pa. 234, 317 A.2d 288 (1974); *Commonwealth v. Woods,* 455 Pa. 1, 312 A.2d 357 (1974), cert. denied, 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974); *Commonwealth v. Canales,* 454 Pa. 422, 311 A.2d 572 (1973); *Commonwealth v. Bynum,* 454 Pa. 9, 309 A.2d 545 (1973); *Commonwealth v. Miller,* 429 Pa. 645, 241 A.2d 346 (1968).

**20.** Errors were found harmless on the basis of cumulative evidence in *Commonwealth v. Rodgers,* 472 Pa. 435, 372 A.2d 771 (1977) (plurality opinion); *Commonwealth v. Knight,* 469 Pa. 57, 364 A.2d 902 (1976); *Commonwealth v. Cummings,* 466 Pa. 332, 353 A.2d 381 (1976); *Commonwealth v. Fay,* 463 Pa. 158, 344 A.2d 473 (1975); *Commonwealth v. Moore,* 462 Pa. 231, 340 A.2d 447 (1975) (relying in part on cumulative evidence); *Commonwealth v. Saunders,* 459 Pa. 677, 331 A.2d 193 (1975); *Commonwealth v. Ashburn,* 459 Pa. 625, 331 A.2d 167 (1975); *Commonwealth v. Turner,* 456 Pa. 309, 320 A.2d 113 (1974) (opinion in support of affirmance); *Commonwealth v. Greene,* 456 Pa. 195, 317 A.2d 268 (1974) (plurality opinion) (alternative holding); *Commonwealth v. Brittain,* 455 Pa. 562, 317 A.2d 219 (1974); *Commonwealth v. Hancock,* 455 Pa. 583, 317 A.2d 588 (1974); *Commonwealth v. Fell,* 453 Pa. 531, 309 A.2d 417 (1973); *Commonwealth v. Mamon,* supra (relying in part on cumulative evidence); *Commonwealth v. Budd,* 443 Pa. 193, 278 A.2d 879 (1971); *Commonwealth v. Henderson,* 441 Pa. 255, 272 A.2d 182 (1971).

**21.** "The theory [underlying the cumulative evidence approach] is that the tainted evidence added nothing to the government's case, and the error is therefore harmless." Field, supra note 16, at 37.

Until recently, this Court applied the cumulative evidence test on a case by case basis without explicitly outlining the elements of the test. Professor Field has suggested that three requirements must be met before a court may conclude that improperly admitted evidence was merely cumulative of other evidence presented and therefore did not affect that jury verdict:

"(1) There should be substantial similarity, in type of evidence and incriminating factual details, between the tainted evidence and the

■ The Commonwealth does not argue that the error in admitting evidence concerning Officer Wallace's family life and professional reputation was harmless because the impact of the error was *de minimis*[22] or the improperly admitted evidence was merely cumulative. Rather, the Commonwealth argues that any error in the admission of this evidence was harmless in light of overwhelming evidence of appellant's guilt.

■ This Court has stated that an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.[23] *Commonwealth v. Davis*, 452 Pa. 171, 178–79, 305

untainted evidence of which it is 'cumulative.' (2) The untainted evidence should be indisputable, either because the facts are in some way affirmatively accepted by the defendant or for other reasons. (3) Care should be taken that the 'untainted' evidence in no way derives from the tainted evidence."
Id. at 55. See *Commonwealth v. Parker*, 458 Pa. 381, 327 A.2d 128 (1974) (error not harmless where untainted evidence substantially similar to tainted evidence); *Commonwealth v. Turner*, 454 Pa. 439, 311 A.2d 899 (1973) (error not harmless where untainted evidence may have derived from tainted evidence); see generally, *Commonwealth v. Laws*, 474 Pa. 318, 378 A.2d 812 (1977) (plurality opinion); *Commonwealth v. Rodgers*, supra, 472 Pa. at 460, 372 A.2d at 783 (concurring and dissenting opinion of Nix, J.).

22. See note 6, supra.
An error is less likely to be harmless if the erroneously admitted evidence was emphasized at trial. Compare *Commonwealth v. Padgett*, 428 Pa. 229, 237 A.2d 209 (1969), with *Commonwealth v. Pearson*, 427 Pa. 45, 233 A.2d 552 (1967). Here, the Commonwealth stressed the erroneously admitted evidence in its closing argument:
"Let's not forget Pat Wallace. He is the police officer who was murdered. Let's not forget him. That is why we are here. A young police officer in the prime of his life murdered at age thirty-two, a father, a husband, a friend, respected by the community, loved by his family, died with his revolver snapped in his holster last July 3rd, dead on arrival at Columbia Hospital, left his wife that morning never to return, meeting sudden death on the street by this man."

23. As this formulation of the overwhelming evidence test suggests, an error may be so prejudicial that it is not harmless even though there is overwhelming evidence of defendant's guilt. See *Commonwealth v. Dobson*, 465 Pa. 91, 348 A.2d 132 (1975); *Commonwealth*

A.2d 715, 719 (1973); accord, *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). Under this approach, a reviewing court first determines whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt. If " 'honest, fair minded jurors might very well have brought in not guilty verdicts,' " an error cannot be harmless on the basis of overwhelming evidence. *Commonwealth v. Davis*, 452 Pa. at 181, 305 A.2d at 721, quoting *Chapman v. California*, 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967). Once the court determines that the evidence of guilt is overwhelming, it then decides if the error was so insignificant by comparison that it could not have contributed to the verdict.

We have cautioned that

"a conclusion that the properly admitted evidence is 'so overwhelming' and the prejudicial effect of the . . . error is 'so insignificant' by comparison, that it is clear beyond a reasonable doubt that the error is harmless, is not to be arrived at lightly."

*Commonwealth v. Davis*, supra, 452 Pa. at 178–79, 305 A.2d at 720. Accordingly, we have been reluctant to find an error harmless on the basis of overwhelming evidence.

 Our cases support the proposition that in deciding whether an error is harmless because there is properly admitted overwhelming evidence of guilt, the untainted evidence relied upon must be uncontradicted.[24] This follows

*v. Barron*, 438 Pa. 259, 264 A.2d 710 (1970); *Commonwealth v. Pearson*, 427 Pa. 45, 233 A.2d 552 (1967).

**24.** The determination whether an error is harmless because of overwhelming evidence is closely tied to the facts of a particular case, requiring examination of the entire record. Unfortunately, this determination is often made with little or no analysis. See Field, supra, note 16 at 36 ("the overwhelming evidence test . . . entails a commitment to examine in detail what may be a very complicated and extensive record . . . only to render a decision devoid of precedential value because so closely tied to the facts of the case"). Thus, it is not surprising that a few of our cases do not say whether the overwhelming evidence was uncontradicted. Even so, our research reveals no case in which this Court clearly departed from the

the test applied by Mr. Justice Rehnquist for the Court in *Schneble v. Florida*, 405 U.S. 427, 431, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972), where the improper admission of a co-defendant's confession was held harmless because the evidence supporting the prosecution's theory was "overwhelming" and "not contradicted by any other evidence in the case."

In *Commonwealth v. Henderson*, 456 Pa. 234, 317 A.2d 288 (1974), this Court, per Mr. Justice Eagen (now Chief Justice), held an error not harmless under the overwhelming evidence test because there was evidence in the case which contradict-

requirement that an error cannot be found harmless on the basis of overwhelming evidence unless the evidence is uncontradicted.

Two of our cases which purport to rely on overwhelming evidence do so only in part; these cases also determine that the prejudice from the error was *de minimis*, or that the challenged evidence was merely cumulative. *Commonwealth v. Knight*, 469 Pa. 57, 364 A.2d 902 (1976) (cumulative); *Commonwealth v. Collins*, 440 Pa. 368, 269 A.2d 882 (1970) (semble) (*de minimis*).

Similarly, a third case, *Commonwealth v. Dancer*, 452 Pa. 221, 305 A.2d 364 (1973), is better analyzed under the cumulative evidence test than under the overwhelming evidence test. Although the Court purported to apply the overwhelming evidence test, the evidence relied on was not overwhelming as to all the elements of the crime. Rather, the evidence relied on tended to prove the same facts as the improperly admitted evidence. Moreover, in two previous cases this Court had determined in similar circumstances that the same error as was made in Dancer's trial was *de minimis*. *Commonwealth v. Stafford*, 450 Pa. 252, 299 A.2d 590 (1973) (dictum); *Commonwealth v. Knudsen*, 443 Pa. 412, 278 A.2d 881 (1971).

Our research reveals three additional cases in which this Court found an error harmless on the basis of overwhelming evidence. *Commonwealth v. Thomas*, 443 Pa. 234, 279 A.2d 20 (1971); *Commonwealth v. Witherspoon*, 442 Pa. 597, 277 A.2d 827 (1971); *Commonwealth v. Diaz*, 438 Pa. 356, 264 A.2d 592 (1970). In these cases, it is unclear whether the Court found the evidence relied on was uncontradicted. *Commonwealth v. Thomas*, supra, offers no analysis of what evidence the Court relied on, or how the Court applied the overwhelming evidence test. In *Commonwealth v. Witherspoon*, supra, and *Commonwealth v. Diaz*, supra, the Court summarized the evidence relied upon, but did not state if it had determined that the evidence was uncontradicted. To the extent that these cases might suggest that this Court may find harmless error on the basis of overwhelming evidence without first determining if the evidence is uncontradicted they are inconsistent with the proper standard for finding harmless error. See *Commonwealth v. Hale*, 467 Pa. 293, 356

ed the guilt of the defendant. In that case, we distinguished *Commonwealth v. Camm*, 443 Pa. 253, 277 A.2d 325, cert. denied, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972) (holding an error harmless), because in *Camm* "there was no evidence that could have supported acquittal." 443 Pa. at 268–69, 277 A.2d at 333, quoted at 456 Pa. at 242, 317 A.2d at 293. In *Henderson*, however, "There was . . . evidence to support an acquittal," and thus the untainted evidence could not be considered overwhelming.

In *Commonwealth v. Lasch*, 464 Pa. 259, 346 A.2d 547 (1975), the Commonwealth argued that the improper admission of Lasch's pre-trial statement to the police was harmless error, relying on the testimony of an eyewitness and a second individual to whom Lasch allegedly made an incriminating admission. Lasch did not testify at trial and offered no evidence disputing the testimony of the Commonwealth witnesses. This Court nevertheless held that the error was not harmless, reasoning that the defendant's cross-examination cast doubt upon the credibility of the two witnesses. Accord, *Commonwealth v. Davis*, supra.

In *Commonwealth v. Tucker*, 452 Pa. 584, 307 A.2d 245 (1973), the Commonwealth improperly cross-examined its own witness. The Commonwealth argued that there was overwhelming evidence of Tucker's guilt, based upon his in-custody statement implicating himself in the crime. We held that, because the accuracy of this statement was disputed, the evidence of guilt was not overwhelming.

The requirement that the "overwhelming" evidence relied upon be uncontradicted follows from the principle that an error cannot be harmless if " 'honest, fair minded jurors might very well have brought in not guilty verdicts.' " *Commonwealth v. Davis*, supra, 452 Pa. at 181, 305 A.2d at 721, quoting *Chapman v. California*, supra, 386 U.S. at 18, 87 S.Ct. at 829. A jury has the duty to weigh the evidence and resolve conflicts therein. *E. g., Commonwealth v. Murray*, 460 Pa. 605, 334 A.2d 255 (1975). Unless the evidence is

A.2d 756 (1974); *Commonwealth v. Lasch*, 464 Pa. 259, 346 A.2d 547 (1975); *Commonwealth v. Tucker*, 452 Pa. 584, 307 A.2d 245 (1973).

uncontradicted a fair minded juror may well choose to credit the defendant's, rather than the Commonwealth's evidence.

The principle is in accord with the proper function of an appellate court. An appellate court is ill equipped to resolve conflicts in the evidence or make findings of fact. See generally *Commonwealth v. Rose,* 463 Pa. 264, 344 A.2d 824 (1975); *Commonwealth v. Oates,* 448 Pa. 486, 295 A.2d 337 (1972). As former Chief Justice Traynor has written:

"The appellate court is limited to the mute record made below. Many factors may affect the probative value of testimony, such as age . . . intelligence, experience, occupation, demeanor, or temperament of the witness. A trial court or jury before whom witnesses appear is at least in a position to take note of such factors. An appellate court has no way of doing so. It cannot know whether a witness answered some questions forthrightly but evaded others. It may find an answer convincing and truthful in written form that may have sounded unreliable at the time it was given. A wellphrased sentence in the record may have seemed rehearsed at trial. A clumsy sentence in the record may not convey the ring of truth that attended it when the witness groped his way to its articulation. What clues are there in cold print to indicate where the truth lies? What clues are there to indicate where the half-truth lies?"

R. Traynor, The Riddle of Harmless Error 20–21 (1970). Resolution of conflicts in the evidence in order to ascertain if the evidence of guilt is overwhelming would involve a usurpation of the factfinder's function.

We recognize that a guilty verdict indicates that conflicts in the evidence were resolved in favor of the Commonwealth. However, the jury may have relied on the tainted evidence, while unsure of the verity of the untainted evidence. Similarly, the corroboration provided by the tainted evidence may have led the jury to accept the untainted evidence. Unless the evidence claimed to be overwhelming is uncontradicted we cannot conclude, beyond a reasonable doubt, that a jury would have resolved the conflicts in the

same manner absent the improperly admitted evidence. Thus, we hold that, in applying the overwhelming evidence test to determine if an error is harmless, a court may rely only on uncontradicted evidence. The uncontradicted evidence of guilt must be so overwhelming, and the prejudicial effect of the improperly admitted evidence so insignificant by comparison, that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.

## C.

Our review of the record convinces us that the Commonwealth has not established, beyond a reasonable doubt, that the error in admission of evidence concerning Officer Wallace's family life and professional reputation was harmless. The evidence claimed to be overwhelming was in fact disputed.

The Commonwealth's case consisted primarily of: (1) the testimony of the victim's partner, Officer Scanlon, identifying appellant as the killer; (2) a statement allegedly made by appellant shortly after his arrest, in which appellant admitted participation in the crime but denied firing the fatal shot;[25] and (3) the testimony of appellant's uncle placing appellant in Pittsburgh about an hour and a half before the killing.[26] Appellant took the stand in his own

25. In the alleged statement, appellant admitted that he and Robert Davis both fired at the officers from behind a parked car, appellant firing an automatic weapon and Davis firing a revolver. According to the statement, Davis fired the fatal shot. The police found four spent shells from an automatic weapon at the scene, but Commonwealth experts testify that the bullet which struck Officer Wallace was not fired from an automatic weapon. Officer Scanlon testified, on the other hand, that the only person he saw during the shooting was appellant.

26. Other evidence included testimony that appellant owned a gray cadillac, that a gray cadillac was seen in the area shortly after the shooting, and that appellant was seen in Florida with two others connected with the crime, Lafayette Jones and Robert Davis, a few days later. Appellant admitted that he owned a gray cadillac, and that he had been in Florida with Jones and Davis. Appellant explained that they travelled together to Florida after meeting in North Carolina. While the evidence that appellant owned a gray cadillac

418

behalf and testified that he was in Charlotte, North Carolina on the day of the killing. Several defense witnesses corroborated this alibi.

In addition to presenting the alibi defense, appellant challenged Officer Scanlon's identification testimony. On cross-examination, and by introducing conflicting evidence, appellant attacked Officer Scanlon's credibility and ability to see.[27] Appellant also flatly denied making the statement to the police in which he allegedly admitted participation in the crime. Finally, appellant introduced evidence to impeach

and that he was in Florida with Jones and Davis is indisputable, it is certainly not overwhelming evidence of guilt.

**27.** On direct examination, Officer Scanlon testified that on the day of the killing he and Officer Wallace saw Lafayette Jones, the subject of an outstanding arrest warrant, from their patrol car. Officers Scanlon and Wallace went towards Jones' home. On the way, Officer Scanlon twice noticed a gray cadillac. He testified that he recognized appellant as the driver but could not place appellant's name at the time. The officers reached Jones' home, but did not see him there. They continued to drive until they spotted Jones, when they stopped and placed Jones under arrest. Officer Scanlon again saw the gray cadillac down the street. Thirty seconds later, Jones broke away and the officers ran after him. Officer Scanlon testified that he heard a voice yell, "Don't come any closer," after which four shots were fired. Officer Scanlon testified that he saw the man who had been driving the gray cadillac fire in Officer Wallace's direction from behind a parked car. Officer Scanlon pulled his revolver and fired three times.

On cross-examination, the defense brought out that on the day of the killing, Officer Scanlon observed the man he identified as appellant for a total of twelve seconds. For half of that period, Officer Scanlon himself was under fire. Officer Scanlon admitted he could not tell what direction the voice came from, and did not see the gunman behind the parked car until the shots were fired. At that time, the gunman was about eighty-five feet from Officer Scanlon.

Officer Scanlon testified that he recognized appellant, even though he could not place appellant's name at the time, because he had arrested appellant twice before, for loitering and for robbery. Police records indicated, however, that appellant had never been arrested for loitering and that Officer Scanlon had not participated in appellant's robbery arrest.

Officer Scanlon's testimony that appellant had his hair braided on the day of the crime conflicted with the testimony of appellant's uncle. Finally, Officer Scanlon was impeached by prior inconsistent statements.

the officer who claimed he heard this oral statement,[28] and evidence to rebut certain details of the statement.[29]

Thus, we cannot conclude that the evidence of guilt was so overwhelming, and the error of admitting the prejudicial testimony so insignificant by comparison, that the error was harmless beyond a reasonable doubt.

Judgment of sentence reversed and a new trial granted.

POMEROY, J., filed a concurring opinion.

NIX, J., concurs in the result.

POMEROY, Justice, concurring.

I agree with the majority that the trial court erred in allowing the admission into evidence of the testimony of the victim's wife and the photographs of the victim with his crippled daughter. It was also, I think, improper to allow the Commonwealth to present evidence of the victim's good reputation in the community when there had been neither an attack by the defendant on the victim's reputation nor a defense asserted based on the victim's quarrelsome nature. Compare *Commonwealth v. Irwin*, 475 Pa. 616, 381 A.2d 444 (1977). And, I too am unable to conclude that these errors were harmless. Thus I agree that appellant is entitled to a new trial and concur in the order of the court.

**28.** The statement allegedly was taken while the officer was driving appellant to the Public Safety Building after his arrest. The officer testified he took notes of the statement sometime after it was made. After he arrived at the Public Safety Building, appellant refused to make any statement on tape without the presence of a lawyer.

According to the officer, he stopped on the way to the Public Safety Building to investigate an accident. His testimony was supported by two other officers, although their testimony was inconsistent with his in certain details. The two drivers involved in the accident for which the officer claimed he stopped testified for the defense and denied that the officer was at the scene.

The officer testified that, while an attorney for appellant was at the Public Safety Building on the afternoon of the arrest, the attorney told appellant, in the presence of the officer, "The sooner you have the statement taped, the better it will be." The attorney testified at trial, and denied making this statement.

**29.** The statement placed appellant with a James Davis shortly before the killing. James Davis denied this at trial.

My divergence from the majority opinion has to do with the concept of harmless error which it expresses, and which I venture to think is itself seriously harmful to our system of criminal jurisprudence. I remain of the view[1] that trial errors which do not violate a constitutional right of the accused are not subject to the stringent "Chapman" test[2] embraced by Mr. Justice ROBERTS in his opinion for the majority. Hence this opinion.

## I.

It has long been a recognized principle that appellate courts will affirm criminal convictions despite error in the trial court so long as the error did not affect the appellant's right to a fair trial. *See generally* 1 Wigmore, Evidence § 21 (3rd Ed. 1940). This recognition of improper but "harmless" trial court rulings lies in the generally accepted view that "[A] defendant is entitled to a fair trial but not a perfect one." *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476, 484 (1968), quoting *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593, 604 (1953). Thus an appellate court should seek to avoid the "setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709 (1967). The standard by which the prejudicial effect of trial errors might be gauged, however, has been the subject of considerable debate in recent years.[3]

1. *See,* e. g., *Commonwealth v. Light,* 458 Pa. 328, 339, n.7, 326 A.2d 288, 294, n.7 (1974) (plurality opinion); *Commonwealth v. Moore,* 453 Pa. 302, 310, n.1, 309 A.2d 569, 572, n.1 (1973) (dissenting opinion of Pomeroy, J.).

2. " . . . [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 711 (1967).

3. *See* Saltzburg, The Harm of Harmless Error, 59 Va.L.Rev. 988 (1973); Cameron and Osborn, When Harmless Error Isn't Harmless, Law & Soc. Order, 23 (1971); R. Traynor, The Riddle of Harmless

At an earlier stage of our legal history it was generally held that even the most technical and trivial of trial errors would give rise to a new trial.[4] Errors of constitutional magnitude would normally require automatic reversal.[5] Then, in the now famous case of *Chapman v. California, supra,* the Supreme Court of the United States ruled that errors of a constitutional dimension did not require automatic reversal so long as there was no "reasonable possibility that the evidence complained of might have contributed to the conviction." 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710, quoting *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). The opinion in *Chapman,* however, expressly reserved to the individual states the standard by which errors of a non-constitutional nature might be judged.[6] The test which Pennsylvania courts should apply in such a situation is here in issue. I cannot agree with Mr. Justice ROBERTS that a "harmless beyond a reasonable doubt" standard should be adopted as the proper gauge of harmlessness.

## II.

In support of the adoption of the *Chapman* test for state evidentiary purposes, Mr. Justice ROBERTS concludes that such a stringent test is necessary because (1) it will maintain

Error (1970); Gibbs, Prejudicial Error: Admissions and Exclusions of Evidence in the Federal Courts, 3 Vill.L.Rev. 48 (1957).

4. *See,* e. g., R. Traynor, The Riddle of Harmless Error (1970); Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power, 11 A.B.A.J. 217 (1925); Wigmore, Criminal Procedure—"Good" Reversals and "Bad" Reversals, 4 Ill.L.Rev. 352 (1909).

5. *See,* e. g., *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1958).

6. "The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law." 386 U.S. at 21, 87 S.Ct. at 826, 17 L.Ed.2d at 708–709.

the integrity of the standard of proof in criminal trials; [7] (2) the difficult distinction between constitutional and non-constitutional errors will no longer have to be made in deciding whether an error is or is not harmless; (3) the dichotomy in the treatment of errors of constitutional and non-constitutional magnitude is meaningless and should be abrogated; and (4) the danger that a defendant's right to a fair trial might be denigrated can thereby be avoided. Such considerations are of importance in considering what the standard for the review of trial court errors should be; they do not, however, in my view support the position of Mr. Justice ROBERTS. As Mr. Justice Rutledge noted in *Kotteakos v. United States*, 328 U.S. 750, 760, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557, 1564 (1945), the general object of the harmless error doctrine is

" . . . to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving men fairly convicted the multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure, will engender and reflect in a printed record."

I believe that adoption of a *Chapman* standard for the review of trial court errors of a non-constitutional nature, rather than striking a balance among these interests, will inevitably result in the needless reversal of convictions in which guilt has been conclusively established.

First, I do not believe that a standard of review of trial court errors that is less stringent than the *Chapman* test endangers the *Winship* requirement that the prosecution prove all elements of the offense beyond a reasonable doubt. The *Winship* rule applies not to every iota of evidence introduced in a trial, but rather to the sum of the evidence bearing on an element of the crime; that is, when looking at the record as a whole, can it be said that the Commonwealth has proved every fact necessary to constitute the crime with

7. That standard is, of course, proof beyond a reasonable doubt. *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

which the defendant is charged beyond a reasonable doubt? It is entirely possible for the *Winship* standard to be met despite the fact that some minor error has occurred. Second, unlike Mr. Justice ROBERTS, I have confidence in the ability of our appellate courts to distinguish, when necessary, between errors of constitutional and non-constitutional dimension. See e. g., *Commonwealth v. McDowell,* 460 Pa. 474, 333 A.2d 872 (1975); *Commonwealth v. Ransom,* 446 Pa. 457, 288 A.2d 762 (1972); *Commonwealth v. Mills,* 447 Pa. 163, 286 A.2d 638 (1971); *Commonwealth v. Blackman,* 446 Pa. 61, 285 A.2d 521 (1971). Third, while I share Mr. Justice ROBERTS' dislike of differing standards of review for errors of constitutional and non-constitutional proportions, I see no virtue in eradicating the differences by further extending a rule which has been criticized as unduly rigid.[8] And finally, while I agree that a defendant's right to

8. *See* R. Traynor, The Riddle of Harmless Error, (1970), (hereafter "Traynor") where the former Chief Justice of California stated:

"The *Chapman* test itself comes close to automatic reversal. A court faithful to the *Chapman* test could hold that the violation of a constitutional right did not contribute to the judgment, and hence was harmless, only if it could declare a belief to that effect beyond a reasonable doubt, a belief approaching certainty. This degree of belief is equivalent to that currently required by the English courts under *Stirland v. Director of Public Prosecutions.*

"If courts conscientiously apply the *Chapman* test, they will usually find themselves compelled to balk at declaring a belief that there is no reasonable *possibility* that an error influenced the jury. The alternative is to give the test lip service while tacitly discounting it. The very severity of the test invites such discounting to preclude well-nigh automatic reversal. Appellate review would gain in forthrightness as well as reason if appellate courts could judge it highly probable, rather than almost certain, that an error did not affect the judgment. Under such a test a conscientious court would not be compelled to reverse when it believed it highly improbable that an error contributed to the judgment.

"The *highly probable* test would also be a rigorous one, although short of the excessive strictness of the *Chapman* test. It should prove rigorous enough to impel reversal for significant constitutional errors even in an appellate court unsympathetic with updated constitutional safeguards. The more rational the test of harmless error, the more likelihood there would be of its conscientious application.

"Concededly, the application of the *highly probable* test turns on an appellate judge's reflection to the *nth* degree. Concededly also, some judges will be more perceptive than others. Nonetheless a

a fair trial must be insured, I disagree that a standard less strict than *Chapman* will necessarily denigrate such a right. We certainly have a commensurate duty to avoid the waste of time, money and resources entailed in an overly zealous reversal of trials which are basically fair.[9]

### III.

It remains to discuss the standard which I believe strikes the proper balance among the many considerations of the harmless error controversy, and then to apply such standard to the case at bar.

In determining whether a trial error has in fact prejudiced a defendant's rights, an appellate court generally has three options from which to choose. See *Government of Virgin Islands v. Toto*, 529 F.2d 278 (3rd Cir. 1976); *Traynor, supra* at 34. First, a court might affirm if convinced that it is *more probable than not* that the error did not affect the jury's verdict. Such a test, however, is no doubt too lax and,

realistic test, formulated in terms that compel a judge to evaluate the risk that an error affected the judgment, is bound to strengthen the usual professional discipline that attends judicial discretion. The *highly probable* test is much more likely to engender a reasoned judgment than is the *Chapman* test, under which judicial thinking ceases at the first base of *reasonable possibility."* *Traynor*, pp. 43–45 (footnotes omitted, emphasis in original).

Indeed, it is open to speculation as to whether even the Supreme Court of the United States has adhered to the rigidity of the *Chapman* test. See, e. g., *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) where that Court, while purporting to follow *Chapman*, affirmed convictions on the basis of "overwhelming" evidence despite *Chapman's* emphasis on whether the error made any contribution whatsoever to the verdict.

**9.** Implicit in the opinion of Mr. Justice ROBERTS is the view that the *Chapman* standard is constitutionally required to protect against the prejudice of trial court errors. The Supreme Court of the United States indicated, however, that the *Chapman* standard was fashioned in the absence of "appropriate congressional action." 386 U.S. at 21, 87 S.Ct. at 824, 17 L.Ed.2d at 709 (1967). Thus, it is not at all clear that such a standard is constitutionally required even for errors of constitutional magnitude. Accordingly, I remain unconvinced that such a standard is the only permissible standard capable of guaranteeing a defendant's right to a fair trial.

as Chief Justice Traynor has noted, allows an appellate judge to stray into an inquiry as to the correctness of the result reached below rather than focusing on the effect the error might have had on the jury. *See Traynor, supra* at p. 35. Second, a court might affirm where it is convinced that it is *highly probable* that the error did not contribute to the verdict. See *Government of Virgin Islands v. Toto, supra; U. S. v. Savage*, 430 F.Supp. 1024 (M.D.Pa.1977). Lastly, a court might affirm where it is almost certain that the error in no way affected the verdict. This, of course, is the standard adopted in *Chapman*.

In choosing among these alternatives, I am guided largely by the reasoning of Chief Justice Traynor. With him, I am convinced that the middle course—a standard of high probability—strikes the best balance between the state's interest in efficient and realistic operation of the judicial system and the defendant's right to a fair trial. In Chief Justice Traynor's words:

"What about the appellate court, when it is called upon to determine whether or not an error affected the judgment? How much of a true believer should it be? What degree of probability should it require that the judgment is contaminated? Should it affirm if it believes that it is more probable than not that the error did not affect the judgment? Highly probable that it did not? Almost certain that it did not?

\* \* \* \* \* \*

"The nebulous test of reasonableness is unlikely to foster uniformity either in the application of standards, should there be any, or in the pragmatic exercise of discretion. Discretion is at least under better control within tests that focus on the degree of probability as more probable than not, highly probable, or almost certain. I should welcome a test of high probability for harmlessness. Given an error that affected a substantial right, the judgment below is suspect. Unless the appellate court believes it highly probable that the error did not affect the judgment, it should reverse.

"Any test less stringent entails too great a risk of affirming a judgment that was influenced by an error. Moreover, a less stringent test may fail to deter an appellate judge from focusing his inquiry on the correctness of the result and then holding an error harmless whenever he equated the result with his own predilections.

"There are objections also to the two tests that are more stringent than that of *high probability*. If the test were the mere presence of error, appellate courts could reverse, as many did in the nineteenth century, for any error, no matter how trivial. The end result was public disaffection with the judicial process. Almost as stringent is a test that would require reversal unless the court was *almost certain* that the error did not affect the judgment. This test, adopted by Baron Parke in *Crease v. Barrett*, still prevails in England. It is also the test prescribed by the United States Supreme Court when error is of constitutional dimension."[10] *Traynor*, pp. 34–35 (footnotes omitted).

I think the time has come for us to articulate a standard by which non-constitutional error will be judged in the Pennsylvania appellate process. The standard, in my view, should be that such an error will result in the reversal of a conviction where the reviewing court cannot say, with a high degree of probability, that the error has not influenced the determination of the jury; otherwise, the judgment should be affirmed.

## IV.

When the evidence in this case is reviewed with the above standard in mind,[11] I cannot conclude that it is highly

**10.** In this regard I note that Mr. Justice ROBERTS cites *Traynor*, *supra* for the proposition that justice will be served by application of a uniform standard for both constitutional and non-constitutional errors. It is clear, however, that Justice Traynor does not support further extension of the *Chapman* rule, but rather supports the uniform adoption of the "high probability" standard.

**11.** In my view, the determination of whether error was or was not harmless is to be made against the background of the entire eviden-

probable that the errors which crept into this case did not contribute to the verdict of guilty against Stanton Story. It is true that the prosecution adduced proof quite apart from that here challenged which, while not overwhelming, was ample to establish Story's guilt. On the other hand, the Commonwealth's case was tainted from the outset by totally irrelevant material in the form of the testimony of the widow of Patrick Wallace, the victim, the photograph of the victim on the beach with his young child, the fact that the

tiary record, not merely the "uncontradicted" evidence. The latter approach, espoused by Mr. Justice ROBERTS, is I think, unnecessarily rigid and restrictive.

A reviewing court must, of course, discount evidence where its reliability has been undermined by contrary evidence; the inquiry must be the likely effect of the error on the jury's determination, regardless of whether the evidence might otherwise be sufficient to sustain a verdict of guilty. See, e. g., *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976); *Commonwealth v. Rankin*, 441 Pa. 401, 272 A.2d 886 (1971).

I have no doubt that appellate courts in this Commonwealth possess the ability to scrutinize the record as a whole to arrive at an intelligent judgment as to whether or not it is highly probable particular errors influenced the jury's verdict. The narrow approach of my brother ROBERTS, moreover, would be difficult of application, for who is to say what constitutes "contradiction"? For example, might an otherwise overwhelming case be contradicted simply by an unsupported defense assertion of alibi? This problem is pointed up by the division of the Supreme Court in *Schneble v. Florida, supra,* where the majority of the Court found overwhelming "uncontradicted" evidence so as to render the asserted error harmless, whereas a strong dissent by three members of the Court would have reversed the conviction on the ground that the prosecution's case in chief depended upon a statement allegedly given by the appellant which the dissenters discredited on the ground it was contradicted by appellant's claims of police coercion.

While I share Mr. Justice ROBERTS' concerns that an appellate court respect the discretion of the factfinder to believe or disbelieve the offered evidence, a determination based solely upon a mechanical determination of what evidence is "uncontradicted" simply avoids what is admittedly a difficult appellate task but a task, nevertheless, which I believe is critical to a proper finding of "harmlessness". As Chief Justice Traynor noted: "Concededly, once he [an appellate judge] undertakes to evaluate error, he is driven to reviewing the whole record, even to weighing the evidence. Nevertheless I believe that in the process it is possible for him deliberately to put aside the question of the correctness of the judgment. Given the will, he finds intuition and reasoning working as one to keep his

child was crippled, and the fact that Wallace, a police officer, enjoyed a splendid reputation. These factors were calculated to excite the sympathy of the jury, and formed a mental picture in the minds of the jurors before they heard any of the operative facts of the case.[12] I think it quite possible that these images did in fact have the purpose intended; they made impossible the unemotional approach with which jurors should undertake the difficult and important task of reaching objective and reasoned verdicts. By insisting on creating this kind of "profile" of the slain man, the prosecution, with the permission of the court, engaged in the kind of "overkill" which unhappily causes verdicts to be set aside in the interest of assuring, not a perfect trial, but a trial which meets the ordinary standards of fairness. It is for this reason that I concur in the judgment of the Court.

inquiry in focus on the degree of probability that error influenced the result." *Traynor, supra* at 36 (footnote omitted).

12. We are not unmindful of the feelings of outrage which attend the cruel and senseless murders of innocent citizens or the concern of the victims and of society that the perpetrators be apprehended and punished. It is, however, precisely these emotions which can endanger an individual's right to be presumed innocent. Courts have a duty to insulate a jury from such influences so as to assure as far as possible that a verdict is the result of a dispassionate consideration of the question whether the *defendant* did indeed perpetrate the acts of which he stands charged.