COMMONWEALTH of Pennsylvania,
Appellee

v.

Terry BROWN, a/k/a Antonio
Lambert, Appellant.

Superior Court of Pennsylvania.

Submitted Oct. 6, 2003.
Filed June 8, 2004.
Reargument Denied Aug. 12, 2004.

**1030**

Fortunato N. Perri, Philadelphia, for appellant.

Hugh J. Burns, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before: DEL SOLE, P.J., KLEIN and CAVANAUGH, JJ.

CAVANAUGH, J.:

¶ 1 This appeal is from a life sentence imposed after a jury found appellant guilty of first degree murder, robbery, criminal conspiracy, and possession of an instrument of crime. Appellant seeks a new trial based upon prejudicial remarks made by the prosecutor in closing argument and upon his being jointly tried with a co-defendant. Because appellant was denied his right to confront a witness against him, in violation of the Sixth Amendment to the U.S. Constitution, we vacate the judgment of sentence and remand for a new, separate trial.

¶ 2 The charges against appellant [1] pertain to the shooting death of the victim, Mary Edmond, on February 23, 2001, at approximately 7:45 p.m., in the West Oak Lane section of Philadelphia. On that date, appellant-Lambert was in the company of Miguel Garcia and Anthony Cheatham. The threesome spent the afternoon together driving around the neighborhoods of North Philadelphia and West Oak Lane in Garcia's car, smoking marijuana and ingesting Xanax pills. In the early evening, Cheatham went home. Many hours later, appellant-Lambert, Garcia, and a third individual, Donovan Weary, were stopped in Garcia's car by police officers in a different neighborhood. All three ran away from the officers, and, after a chase, all three were apprehended. As he ran from an officer, Garcia discarded the gun which was used to shoot Mary Edmond. While in custody on February 24, 2001, Garcia made a statement to homicide detectives. Garcia's statement implicated appellant-Lambert in the shooting of Mary

---

**1.** In the trial court, appellant was principally referred to as Antonio Lambert, and we shall refer to him only by that name.

Edmond and detailed his own and Cheatham's involvement.

¶ 3 The only evidence introduced against appellant at trial directly linking him to the crime was provided by Cheatham. Although Garcia did not testify at trial, his statement was admitted as evidence against him, but not admitted as evidence against Lambert. Since Garcia's statement contained references to Lambert, it was read in redacted form by a detective to the jury. Each time Garcia's statement actually used Lambert's name, the detective said "the other guy." The rendition of events offered by Cheatham at trial and by Garcia in his statement differed in significant respects.

¶ 4 Cheatham testified that on February 23, 2001, he met up with Garcia, whom he had known as a friend from the neighborhood for about four or five years, at about two o'clock in the afternoon. They drove around the neighborhood in Garcia's Monte Carlo automobile and smoked one or two marijuana cigarettes, or blunts, between them. Two or three hours later they picked up Lambert. Cheatham moved from the front passenger seat to the back seat, and appellant sat in the front passenger seat. After Lambert joined them, they went to North Philadelphia where Garcia bought some Xanax pills from a street dealer. They each took a pill, and Cheatham began to get very tired. At approximately quarter to seven in the evening, the group returned to West Oak Lane. Cheatham asked to be dropped off at home since he was tired and he wanted to watch a basketball game on television. Garcia stopped at a gasoline station around the corner from Cheatham's home, at 15th Street and Cheltenham Avenue, and bought gas. After the purchase, Garcia left the gas station, and after they had driven about half a block, appellant told him to, "Hold up one second, pull over." Garcia stopped the car, and

appellant got out. Garcia got out about 30 seconds after appellant, and then both appellant and Garcia were out of Cheatham's sight. Cheatham stayed in the back seat of the car. Less than 30 seconds later, as Garcia was in the process of getting back in the car, Cheatham heard a gunshot that sounded very close by. Lambert got back in the car with a silver gun in his hand. Garcia asked him what he had just done, and appellant told Garcia to shut up and drive the car. Cheatham asked what happened, but neither Garcia nor appellant answered him. About five minutes later, Garcia let Cheatham out of the car near a friend's house. He fell asleep at the friend's house and then went to his grandmother's. He learned about the shooting of Ms. Edmond the next morning when detectives came to question him at his grandmother's house.

¶ 5 Cheatham and his mother went to police headquarters the day after the shooting where he gave a statement to homicide detectives. Cheatham was told by them that he would be charged if he did not tell them what happened. As part of cross-examination, defense counsel for appellant and for Garcia questioned Cheatham about the statement he made to the police and about his testimony at the preliminary hearing.

¶ 6 At trial, a detective read Garcia's statement to the jury. Before the detective's testimony regarding Garcia's statement, the court instructed the jury that it could be considered only as evidence against Garcia and could not be considered as evidence against Lambert. In his statement, Garcia admitted to being present on 15th Street just south of Cheltenham Avenue when an elderly woman was robbed and shot. The statement in redacted form continued as follows:

Q. Who was with you?

A. Me and two other guys.

Q. Were you in a car or were you walking?

A. I was driving my car. It's a gray Monte Carlo, a '81.

Q. Tell us what happened.

A. It was me and another guy. We were driving around and we picked up a third guy. We copped a dime of weed off of him. One of the guys said want to go down 7th and Pike to get some Xanies. We was going down north to get some Xanies, but I went to the Hess station at 15th and Cheltenham first. When we pulled out of the Hess station I was driving down 15th Street. There was a lady walking up 15th Street. It was dark. One of the guys said stop, I know her, y'all. I stopped and one of the other guys got out and went up to the lady.

Q. Excuse me, could you read that again?

A. I stopped, I'm sorry, and both of the other guys got out and went up to the lady. That's when I saw a tussle. The lady was backing up holding her purse. She yanked back, she resisted and I heard a gunshot. Then both guys ran to the car. We was high, we needed a little change. I didn't know that was going to go down.

Q. What happened next?

A. They got in the car and I said with the fuck happened. One of the guys said I banged the bitch, I ain't playing, I'm showing these niggers out here I'm not playing. She wouldn't give up her pocketbook or nothing, so I banged her. The other guy said I just ran. I told the first guy what the fuck, you didn't tell me you had a burner.

Q. What is a burner?

A. A gun.

Q. What kind of gun did the first guy have?

A. A .38. He showed it to me in my house after he shot the lady. After he

shot the lady we went to my house and we went inside. He pulled it out in the kitchen. I told him to put it away because my peoples was there. My mom told me to get the guy out of her house. We left my house and drove down North Philly.

Q. Tell us how you and the other guys came to be arrested.

A. I don't know exactly where we were at, but the cops stopped us and I pulled over first, but one of the guys said I'm not trying to get locked up man, so I took off and the cops chased us. We crashed at 3rd and Cayuga and we all ran. One of the guys threw the burner at me and ran. I picked up the burner and ran for a block and just threw it.

Q. Do you remember anything specific about the lady who was robbed and shot?

A. I remember she had a beige pocketbook. That's it.

Q. Detective Mangioni is showing you a gun. Do you recognize it?

A. That's the gun.

Q. Did the guy with the gun say anything to you when the police stopped you?

A. He told me to take the heater and run.

Q. Did the three of you discuss anything after you were arrested?

A. We were downstairs and one of the guys said don't snitch because I ain't saying nothing.

¶ 7 The statement then noted that Garcia's mother had arrived and Garcia drew a diagram of the shooting scene. After Garcia and his mother reviewed the statement, the following was added to it:

A. ...On page 5 at my mother's house I told the guy with the gun to put up his gun and he didn't do it. At that point he said to me, dog, you

better not ever cross me or snitch on me because you know what the deal is.

Q. What did the other guy mean by what the deal is?

A. He would shoot me.

¶ 8 On Friday, June 7, 2002, the prosecutor closed to the jury. The portion of the prosecutor's closing argument which appellant asserts is the basis for a new trial is as follows:

Cheatham says take me home, so they drop him off at his friends house and he doesn't know from anything what they do after that. If Garcia had not been part of what happened, how easy would it have been for him to drop Lambert off, go home, tell his mother what happened, pick up the phone and call the police and say I was just with a guy who shot and killed somebody? He doesn't do that. What does he do is this, he takes Lambert to his house. They're at his house and he says the guy I'm with brings the gun into my house and I tell him put it away because my people are there.

Mr. Perri [appellant's counsel]: May we see the Court?

The Court: I'm going to permit argument. Go ahead.

Ms. Rubino [prosecutor]: He takes him home and he says that the guy he's with had the gun in his house and he told him to put the gun away because my people were there. My mom told me to get the guy out of her house. We left my house and drove down to North Philly.

He's still with the guy that did the shooting. He's not concerned about it. He's not afraid of him. What does he do? He drives around with him for a few more hours. They pick up Donovan Weary after they drop off Mr. Cheatham and now they're out of that area, they stay far away from where they know that they're wanted, where they know that the car may have been spotted and they head over to the eastern part of Philadelphia. Now, they're at 3rd and Hunting Park, 5th and Hunting Park, and it's 3:20 in the morning. The homicide occurs before 8 o'clock p.m. It's now some seven hours later and they're still together. Garcia is not afraid of him, he' up there having fun with him still and Weary is in the car.

¶ 9 On Monday, June 10, 2002, in response to the objection and motion for mistrial by defense counsel, the court offered to give the following instruction to the jury:

Ladies and gentlemen, in her closing argument Ms. Rubino told you that defendant Miguel Garcia drove defendant Antonio Lambert to his home. That is to Garcia's home. I instruct you that you may not—I'm sorry, I instruct that you may not use statement of Mr. Garcia as evidence that he drove Mr. Lambert anywhere or even that Mr. Lambert was in Mr. Garcia's automobile. As I told you before, you must not use the statement of Mr. Garcia in any way as evidence against Mr. Lambert.

¶ 10 Counsel for appellant renewed the motion for mistrial and asked the court not to give the proposed instruction so as not to highlight the issue. The court did not give this specific instruction. After further discussion with all counsel about the contents of the charge to the jury, the court delivered its instructions, which included the following:

As you consider the evidence you must do so separately as to each defendant. You will be required to render separate verdicts as to each defendant on each of the charges and you must exercise caution not to consider against one defendant evidence admitted against the other defendant.

\* \* \* \* \*

Again, remember you are to consider the evidence separately as to each defendant and render separate verdicts as to each defendant while exercising caution not to consider against one defendant evidence admitted against the other defendant.

\* \* \* \* \*

Ladies and gentlemen, there is a rule which restricts use by you of the evidence offered to show that defendant Miguel Garcia made a statement concerning the crime charged. A statement made before trial may be considered as evidence only against the defendant who made the statement. Thus, you may consider the statement as evidence against defendant Miguel Garcia if you believe that he made the statement voluntarily. You must not, however, consider the statement as evidence against defendant Antonio Lambert. You must not use the statement in any way against Mr. Lambert.

\* \* \* \* \*

And remember you may consider the statement as evidence against defendant Miguel Garcia only. You must not use the statement in any way against defendant Antonio Lambert.

■ ¶ 11 The appellant maintains that the prosecutor's use of his name, Lambert, in connection with evidence obtained solely from Garcia's statement requires the granting of a new trial. The Commonwealth argues the inclusion of Lambert's name in the prosecutor's argument was a fleeting, inadvertent error made while she was addressing the case against Garcia,

and not against Lambert, that does not warrant relief.

■ ¶ 12 The Confrontation Clause of the Sixth Amendment to the Constitution of the United States provides that an accused enjoys the right to be confronted with the witnesses against him. Testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine. *Crawford v. Washington,* 541 U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177, 203 (2004). Included within the ambit of testimonial statements are those made during police interrogations. *Id.,* —— U.S. at ——, 124 S.Ct. at ——, 158 L.Ed.2d at 193. "Where testimonial statements are at issue, the only indicum of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.,* at ——, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.

■ ¶ 13 In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court held that where the statement of a non-testifying co-defendant names the defendant as a participant in the crime, even if the jury is instructed to consider the confession only against the co-defendant as maker of the statement, the defendant is denied his Confrontation Clause rights. *See Commonwealth v. Miller,* 572 Pa. 623, 819 A.2d 504, 511 (2002).[2] Where the statement of the non-testifying co-defendant is redacted so as to omit any reference to the name or to the existence of the

---

2. Certain recent decisions of the Pennsylvania Supreme Court, *e.g., Commonwealth v. Robins,* 571 Pa. 248, 812 A.2d 514 (2002) and *Commonwealth v. Overby,* 570 Pa. 328, 809 A.2d 295 (2002), are of limited utility in analyzing the issues in this case because of their status as plurality dispositions and because they predate the U.S. Supreme Court's deci-

sion in *Crawford, supra.* In *Crawford,* the Supreme Court reinforced the constitutional right of confrontation where the state seeks to offer testimonial hearsay against a defendant, regardless of other "indicia of reliability" that might permit admission of the statement under the rules of evidence.

defendant, it may be admitted at a joint trial where the court instructs the jury not to consider the statement against the defendant. *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Commonwealth v. Travers,* 564 Pa. 362, 768 A.2d 845 (2001).

¶ 14 A prosecutor may not vitiate the effect of a redacted statement by referring to the defendant by name during the course of argument to the jury. *Commonwealth v. Rawls,* 276 Pa.Super. 89, 419 A.2d 109, 113 (1980); *See also Commonwealth v. McCrae,* 574 Pa. 594, 832 A.2d 1026, 1039 (2003) (noting that defendant's right to confrontation by non-testifying declarant may be violated by prosecutor's closing argument).

■ ¶ 15 While the Commonwealth recognizes that the prosecutor's argument that appellant had been named by co-defendant Garcia in his statement to police was improper, it nonetheless argues that this infraction is harmless error primarily because of the trial court's offer to give a curative instruction, which was rejected by appellant, and its actual instructions to the jury. This argument fails to appreciate the limited value of curative instructions in the context of a *Bruton* violation.

¶ 16 In *Bruton,* the trial court gave the following cautionary instructions:

At the close of the Government's direct case, the trial judge cautioned the jury that Evans' admission implicating petitioner "if used, can only be used against the defendant Evans. It is hearsay insofar as the defendant George William Bruton is concerned, and you are not to consider it in any respect to the defendant Bruton, because insofar as he is concerned it is hearsay."

The instructions to the jury included the following:

"A confession made outside of court by one defendant may not be considered as evidence against the other defendant, who was not present and in no way a party to the confession. Therefore, if you find that a confession was in fact voluntarily and intentionally made by the defendant Evans, you should consider it as evidence in the case against Evans, but you must not consider it, and should disregard it, in considering the evidence in the case against the defendant Bruton.

. . . .

"It is your duty to give separate, personal consideration to the cause of each individual defendant. When you do so, you should analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendant. Each defendant is entitled to have his case determined from his own acts and statements and the other evidence in the case which may be applicable to him."

*Id.,* at 125, n. 2, 88 S.Ct. 1620.

¶ 17 However, the Supreme Court found these instructions inadequate to protect Bruton's right to confront a witness. It held that, "... because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.,* at 126, 88 S.Ct. 1620.

¶ 18 In the instant case, the proposed instruction and the actual instructions did not go any further than the instructions did in *Bruton* to ensure that the jury refrained from considering the inadmissible statement of the co-defendant. Although the trial court did instruct the jury that it was not to consider Garcia's statement as evidence against appellant, under *Bruton* these instructions must be pre-

sumed to be inadequate to protect against the jury's use of it in the case against appellant. Given the prosecutor's actually naming appellant as the person to whom Garcia referred in his statement, as a matter of law it must be found that no subsequent instruction by the trial court could have cured the damage.[3]

¶ 19 Although a *Bruton* violation may constitute harmless error under circumstances where there is overwhelming evidence of appellant's guilt, *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), there is no such overwhelming evidence in this case. Other than Garcia's inadmissible statement, the only other directly incriminating evidence against appellant was the trial testimony of Cheatham, who could have been considered an accomplice by the jury.

¶ 20 The standard has been described by the Pennsylvania Supreme Court as follows:

We realize that contextual implication can impact a defendant's rights under the Confrontation Clause. However, reversible error does not necessarily result from every infringement of a defendant's right to confront witnesses against him. Review under the harmless error standard set forth in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978) is appropriate in such circumstances. *See [Com. v.] Bond*, 539 Pa. [299] at 312, 652 A.2d [308] at 314 [(1995)]. Under *Story*, an error is harmless if it could not have contributed to the verdict because the erroneously admitted evidence is merely cumulative of substantially similar, properly admitted evidence. *See Story*, 476 Pa. at 411, 383 A.2d at 165.

*Commonwealth v. Washington*, 549 Pa. 12, 700 A.2d 400, 407 (1997).

¶ 21 The prosecutor's statement regarding Garcia implicating appellant was not cumulative of substantially similar, properly admitted evidence. There was no evidence which placed Lambert in Garcia's home with the gun. Although he was in Garcia's presence at the time of arrest, it was Garcia, not appellant, who disposed of the murder weapon. Therefore, the prosecutor's reference to Lambert being with Garcia at his home after the shooting with the gun was not harmless error.

¶ 22 Lastly, the lower court abused its discretion in denying the motion for severance. Our review of an order deciding a motion to sever is guided by the following principles:

The decision whether to grant a motion for severance is within the sound discretion of the trial court and will not be overturned absent a manifest abuse of discretion. The defendant bears the burden of proving that he was prejudiced by the decision not to sever, and he must show real potential for prejudice rather than mere speculation. The probability of antagonistic defenses is a factor that trial courts should consider in deciding whether to grant severance, but the claim must be more than bare antagonism. However, when defendants have conflicting versions of what took place, the truth may be more easily determined if all are tried together. When conspiracy is charged, joint trials are advisable.

*Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 137 (2001) (citations omitted).

---

3. As noted above, the lower court did give cautionary instructions to the jury, other than the specific one rejected by defense counsel, during the course of delivering its charge to the jury. However, we find that these instructions, too, must be presumed to have been ineffectual to prevent the jury from considering Garcia's statement against appellant in light of the explicit reference made by the prosecutor in closing argument.

¶ 23 Appellant's defense was in conflict with the Garcia's defense because Garcia's statement was that Appellant ("the other guy") had shot the victim, while Appellant maintained his innocence. Appellant's counsel argued to the jury that it should reject the testimony of Anthony Cheatham who had a motivation to lie about his own involvement and to put the blame on appellant. While Garcia's counsel also attacked the credibility of Cheatham, the admission of Garcia's statement against him was additional evidence that the jury could consider in determining his guilt.

¶ 24 Since the statement of Garcia, even in redacted form, referred to appellant's existence, as one of the "other guys", it constituted a strong basis upon which to order severance. Cheatham's testimony placed Lambert at the shooting scene with the gun in his hand. Since Lambert, and not Cheatham, was arrested with Garcia, it is likely that the jury inferred that Lambert was "the guy" that Garcia said showed him the gun at Garcia's house. It is equally likely that the jury inferred that Lambert was "the guy" Garcia said gave him the gun as they exited Garcia's car in fleeing from the police. We therefore determine that a retrial of appellant should be severed from any future retrial of Garcia, should such a trial be conducted.

¶ 25 We recognize that in *Commonwealth v. Garcia*, 2004 PA Super 61, ¶¶ 13, 14, 847 A.2d 67 (2004), we affirmed co-defendant Garcia's judgment of sentence and found that the lower court did not err in denying Garcia's motion for severance. There is no conflict in our ordering a separate trial for Lambert, in the event Garcia should be awarded a new trial upon further appellate review, since Lambert's reasons for seeking severance are different from those of Garcia, and it would be prejudicial to Lambert to be tried with Garcia.

¶ 26 Given the combined evidence that 1) Cheatham was not charged with any crime and was a Commonwealth witness who implicated Lambert in the shooting (he heard a gunshot nearby and then saw Lambert get back in the vehicle with a gun in his hand), and 2) the assistant district attorney made an argument to the jury sourced in Garcia's statement which, *albeit* inadvertently, identified Lambert as the third member of the trio, it would be hard to imagine an evidentiary matrix wherein the identity of Lambert as the "other guy" or the perpetrator between the "other guys" would be more obvious. The *Bruton* doctrine cannot be used defeat the logic which we must attribute to our juries. No cautionary charge could adequately serve to unring the bell that was so clearly sounded in this case.

¶ 27 Judgment of sentence vacated. Case remand for a new trial. Any new trial shall be conducted separate from any new trial which co-defendant Garcia may be awarded. Jurisdiction is relinquished.