J-A26019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRADY CHRISTIAN PYSADEE | : | |
| | : | |
| Appellant | : | No. 1351 WDA 2024 |

Appeal from the Judgment of Sentence Entered October 17, 2024
In the Court of Common Pleas of McKean County Criminal Division at
No(s):  CP-42-CR-0000531-2022

BEFORE:  OLSON, J., STABILE, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED:  June 8, 2026**

Appellant, Brady Christian Pysadee, appeals from the judgment of sentence entered on October 17, 2024, following his jury trial convictions for drug delivery resulting in death, involuntary manslaughter, recklessly endangering another person, and three counts of possession with intent to deliver narcotics.[1]  Upon careful review, we affirm.

We summarize the facts and procedural history of this case as follows. On June 17, 2021, police found the body of Mercedes Simonds ("Victim") in an apartment in Bradford, Pennsylvania.  Further investigation revealed that Victim died from a fatal dose of fentanyl.  As a result, the Commonwealth charged Appellant with the aforementioned charges.  Pertinent to this appeal, Appellant and the Commonwealth filed motions *in limine* regarding electronic

---

[1]   18 Pa.C.S.A. §§ 2506, 2504, and 2705; 35 § 780-113 §§ (a)(30)(two counts) and (a)(16) (one count), respectively.

and in-person hearsay statements Victim made to various witnesses prior to her death. The trial court held a hearing on the motions on July 23, 2024. On August 7, 2024, the trial court filed an opinion and order granting relief to the Commonwealth.[2] On August 20, 2024, a jury found Appellant guilty of all charges. On October 17, 2024, the trial court sentenced Appellant to an aggregate term of nine to 18 years of incarceration, followed by one year of probation. This timely appeal resulted.[3]

_____

[2] More specifically, and relevant to the current appeal, the August 7, 2024 order stated: "The Commonwealth's motion *in limine* to present testimony at trial of statements made by the alleged victim, Mercedes Simonds, to Patrick O'Hara, Tiffany Teeter, Brandon McCauley, Floyd O'Hara, and Ronald Jackson … is granted." Trial Court Order, 8/7/2024 (superfluous capitalization omitted). With regard to Ronald Jackson, the trial court allowed the Commonwealth to present Jackson's testimony that Victim stated that she "did a line [of brown stuff] with [Appellant] in his truck" that "she didn't feel good" and was "not sure what it was, but [thought] it was possibly heroin [when she thought] it was going to be cocaine, but it had a tint of brown so she wasn't sure." Trial Court Opinion, 8/7/2024, at 7-8; *see also* Appellant's Brief at 4. With regard to Patrick O'Hara, the trial court permitted Patrick to testify that Victim delivered drugs to him after meeting with Appellant, but then told him "don't use that. It's the wrong stuff. I think the bags got mixed up! Because [Appellant] had two bags. I think I did heroin." Trial Court Opinion, 8/7/2024, at 7; *see also* Appellant's Brief at 4-5. With regard to Floyd O'Hara, Patrick's father, the trial court permitted Floyd to testify that Victim said, "the bags got mixed up" and "she did not feel well" because "whatever she did in [Appellant's] car wasn't coke." Trial Court Opinion, 8/7/2024, at 7; *see also* Appellant's Brief at 5.

[3] Appellant filed a timely notice of appeal on October 30, 2024. On October 31, 2024, the trial court entered an order directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Eventually, after this Court directed the trial court "to issue a concise statement order that complies with Rule 1925(b)(3) and serve that order on [c]ounsel for Appellant consistent with Pa.R.Crim.P. 114," Appellant filed a
*(Footnote Continued Next Page)*

On appeal, Appellant presents the following issue[4] for our review:

1. Did the [t]rial [c]ourt err when it allowed the admission of hearsay testimony that conveyed purported statements

_____

timely Rule 1925(b) statement on March 3, 2025. *See* Superior Court *Per Curiam* Order, 1/31/2025. On March 6, 2025, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) that largely relied upon its earlier decision filed on August 7, 2024, but further clarified and specifically addressed case law upon which Appellant relied.

[4] Initially, we will address the Commonwealth's contention that Appellant waived his evidentiary claims by failing to raise at or before trial any objections to statements Victim made to Ron Jackson, Patrick O'Hara or Floyd O'Hara. *See* Commonwealth's Brief at 9. Here, upon review of the certified record, we conclude that Appellant's objections to the statements at issue were argued extensively prior to trial and, thus, properly preserved for our review. Prior to trial, Appellant filed a motion *in limine* and an amended motion *in limine* that addressed the admissibility of Victim's statements to Ronald Jackson. Thereafter, the trial court convened a hearing on July 23, 2024, wherein it directed the Commonwealth to file a brief "setting forth the specifics and detail of the alleged statements" and "the legal basis [for] why these statements [were] admissible." N.T/, 7/23/2024, at 3. The trial court ordered Appellant to file a response afterwards. *Id.* The Commonwealth filed a motion *in limine*, two amended motions *in limine*, and a brief pertaining to all of the statements at issue currently. Appellant then filed a brief in opposition to the Commonwealth's two amended motions *in limine*. In his opposition brief, Appellant, among other things, challenged the admission of Victim's verbal statements to Ronald Jackson, Patrick O'Hara, and Floyd O'Hara under the state of mind and medical treatment exceptions to the rule against hearsay. Ultimately, on August 7, 2024, the trial court entered an order and opinion outlining the proposed statements at issue and permitting their introduction at trial. *See* Trial Court Opinion, 8/7/2024, at 7-9. "A party may claim error in a ruling to admit … evidence only … if the ruling admits evidence [and] a party, on the record … makes a timely objection, motion to strike, or motion *in limine*, and states the specific ground, unless it was apparent from the context." Pa.R.E. 103(a)(1)(A)-(B). "Once the court rules definitively on the record – either before or at trial – a party need not renew an objection or offer of proof to preserve a claim for appeal." Pa.R..E. 103(b). Here, although no objections were subsequently lodged at trial, the trial court definitively ruled on the statements at issue prior to trial, no renewed objections were required, and, therefore, the issue was properly preserved for our review.

[V]ictim made to Ronald Jackson, Patrick O'Hara, and Floyd O'Hara?

Appellant's Brief at 2.

Appellant argues that the trial court erred by allowing the admission of testimony at trial pursuant to the "medical diagnosis or treatment" exception and/or the "then-existing mental, emotional, or physical condition" exception to hearsay, pursuant to Pa.R.E. 803(4) and (3), respectively. *See id*. at 6-13. More specifically, Appellant asserts:

> None of the [] hearsay testimony should have been admissible. As far as the medical treatment exception is concerned, nothing in [Ronald Jackson's testimony that Victim said she] "did a line of brown stuff in Appellant's truck" had anything to do with "medical treatment or diagnosis in contemplation of treatment" because the statement was not rendered to a medical professional for the purpose of receiving treatment. In fact, when offered to be taken to the hospital or have an ambulance called for her, [Victim] *refused* treatment. Thus, the hearsay offered by Mr. Jackson should not have been admitted based on this exception.

> With respect to the "the existing mental, emotional, or physical condition" [hearsay exception] being applicable to [Victim's statement that she] "did a line of brown stuff" relayed by Ron[ald] Jackson; and the "switched the two bags" hearsay relayed by the O'Hara[s], these statements were explicitly forbidden by the language of [Pa.R.E. 803(3)] because they were in fact "statements of memory or belief to prove the fact remembered or believed." Pa.R.E. 803(3).

> Consequently, the lower court's rationale for admitting all this hearsay [evidence] was a misapplication of the law, and thus, an abuse of discretion.

> In any event, even if these hearsay statements were in some way tied to other statements that were admissible under some exception, all of these statements still should have been excluded. [Appellant posits that in] Pennsylvania [] if a statement [] contains *both* a state of mind component *and* a "fact-bound" component, it generally is inadmissible.

               \*           \*           \*

> The purported statement to Ronald Jackson that [V]ictim "did a line of brown stuff in Appellant's truck" is nothing more than a fact-based assertion, and it was explicitly offered to prove the truth of the matter. Even if one could contort themselves into a belief that someone said something that they previously did as an expression of their "state of mind," it cannot be disputed the [Victim's] statement about a line of brown stuff in Appellant's truck are *facts* that go to the heart of this case. The lower court should have [] precluded Ronald Jackson from claiming [V]ictim told him that she did a line of brown stuff in Appellant's truck.
>
> So too should the testimony from the O'Hara[s] been precluded. Specifically, Patrick's testimony that [V]ictim stated:
>
>> Don't use that. It's the wrong stuff. I think the bags got mixed up! **Because** [**Appellant**] **had two bags**. I think I did heroin.
>
> [Said statement] should have been precluded. [V]ictim's expression of what she "thought" was interspersed with factual assertions, i.e., that Appellant had "two bags" and "it's the wrong stuff." This was dual-purpose hearsay, which should have been precluded[.]
>
> The same holds true for Floyd's testimony that [V]ictim said, "the bags got mixed up. Whatever she did in the car wasn't [cocaine]." "The bags got mixed up" is a factual assertion, which renders the entire statement a dual-purpose statement that is forbidden[.]

*Id.* at 7-9 (emphasis in original; original brackets and record citations omitted).

Appellant challenges the trial court's application of the state of mind and medical treatment exceptions to the rule against hearsay. Accordingly, we shall set forth the general principles that govern our review of evidentiary

- 5 -

questions and then turn to the pertinent law addressing the relevant hearsay exceptions. Our Supreme Court has determined:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and [an appellate c]ourt will not reverse the trial court's decision absent an abuse of that discretion.
>
> Hearsay is "a statement ... the declarant does not make while testifying at the current trial or hearing ... [that is offered] in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c)(1)-(2). Statements that meet this definition are not admissible, unless the proffered statement falls within an established hearsay exception.
>
> \*     \*     \*
>
> Technically, [an out-of-court] statement [admitted for the truth of the matter asserted] is hearsay. However, then-existing state of mind statements long have been excepted from the hearsay rule because they possess the "special assurance of reliability" due to "their spontaneity and resulting probable sincerity. The guarantee of reliability is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement."
>
> In Pennsylvania, the admissibility of then-existing state of mind statements is governed by Rule of Evidence 803(3), which provides as follows:
>
>> **Then-Existing Mental, Emotional, or Physical Condition**. A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.
>
> Pa.R.E. 803(3). Pursuant to the state of mind hearsay exception, where a declarant's out-of-court statements demonstrate her state of mind, are made in a natural manner, and are material and relevant, they are admissible pursuant to the exception. Axiomatically, and by its unambiguous terms, the exception renders admissible only those statements that reflect the

- 6 -

"declarant's then-existing state of mind ... or condition," Pa.R.E. 803(3), not someone else's state of mind or condition. Nothing in the plain terms of the exception would allow, for instance, a party to introduce an out-of-court statement of one person to prove the intent, motive, feelings, pain, or health of another person. The bounds of the exception are limited to the then-existing state of mind of the declarant only.

*Commonwealth v. Fitzpatrick*, 255 A.3d 452, 471–472 (Pa. 2021) (case citations, some quotations, and footnote omitted).

Our Supreme Court

distinguish[ed] between the two ways in which a declarant's state of mind can be invoked as a basis for admitting a declarant's out-of-court statement in a legal proceeding. The two often are conflated by courts and practitioners alike. The critical feature that differentiates the two evidentiary proffers is the purpose for which the statement is being offered. If the statement is not being offered for its truth, but instead to show the mental state of the person making it, the statement is admissible only for that limited purpose, and should be accompanied with an accurate limiting instruction to the jury. Such a statement is not admissible as substantive evidence, and cannot be admitted for the truth of the matter asserted.

Indeed, when not offered as substantive proof, the truth of the statement is wholly immaterial. The statement could be something outrageous or impossible—such as "I can fly to the moon." That would not be hearsay at all, as it is meant only to demonstrate to the judge or jury the character of the speaker's mindset at the time of its utterance. *See* 2 McCormick on Evidence § 274 (8th ed.) (explaining that state of mind statements that are not hearsay are not dependent upon the manner in which the statement is uttered or the truth or practicability of the statement). In this example, the statement would be offered to show that the speaker may have been mentally impaired or delusional at the time. It would not be introduced to prove that he (or she) actually can fly to the moon. This [constitutes] non-truth purpose [] state of mind evidence[.]

*Id.*

- 7 -

Moreover,

[a] statement proffered under the state of mind hearsay exception is not *per se* admissible merely because it is an expression of the speaker's then-existing mindset, with nothing more. The statement must also go to a "factor in issue"—i.e., it must be relevant to some contested aspect of the case. "The victim's emotional state must relate to some legitimate issue in the case." 2 McCormick on Evidence § 276 (8th ed.). Finding relevance in a victim's mindset in a criminal case is fairly uncommon. Indeed, a crime victim's state of mind typically is irrelevant and, thus, inadmissible. In murder cases in particular, it is the defendant's state of mind, not that of the victim, which is material to establish the degree of guilt, if any, on the charge of criminal homicide.

Nonetheless, in criminal cases:

> the courts have developed three rather well-defined categories in which the need for such statements overcomes almost any possible prejudice. The most common of these involves defendant's claim of self-defense as justification for the killing. When such a defense is asserted, a defendant's assertion that the deceased first attacked him may be rebutted by the extrajudicial declarations of the victim that he feared the defendant, thus rendering it unlikely that the deceased was in fact the ag[g]ressor in the first instance. Second, where defendant seeks to defend on the ground that the deceased committed suicide, evidence that the victim had made statements inconsistent with a suicidal bent are highly relevant. A third situation involves a claim of accidental death, where, for example, defendant's version of the facts is that the victim picked up defendant's gun and was accidentally killed while toying with it. In such cases the deceased's statements of fear as to guns or of defendant himself (showing he would never go near defendant under any circumstances) are relevant in that they tend to rebut this defense. Of course, even in these cases, where the evidence is of a highly prejudicial nature, it has been held that it must be excluded in spite of a significant degree of relevance.

***United States v. Brown***, 490 F.2d 758, 767 (D.C. Cir. 1973).

*Fitzpatrick*, 255 A.3d at 474–475 (most citations and original brackets omitted).

Furthermore,

While such statements are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding [a] homicide, ... such statements are fraught with inherent dangers and require the imposition of rigid limitations. The principal danger is that the jury will consider the victim's statement of fear as somehow reflecting on defendant's state of mind rather than the victim's—*i.e.*, as a true indication of defendant's intentions, actions, or culpability. Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident.

\*          \*          \*

The quantum of prejudice ... is highest when the circumstantial facts in the statement are intimately related to the issue to be proved. In the context of homicide cases ..., it is clear that where the improper purpose for which the jury might consider the evidence bears closely on the central question of the defendant's guilt or innocence there is less likelihood that the jury will confine the statement to its proper realm.

\*          \*          \*

The more narration of past acts or conduct of the defendant contained in the statement, the greater the danger of jury misuse.

*Id.* at 481, *citing* ***Brown***, ***supra***.

As such, the ***Fitzpatrick*** Court "set forth the general inquiry courts must undertake when contemplating the admissibility of out-of-court statements proffered to the court for admission as state of mind evidence." *Id.* at 479. Our Supreme Court further elaborated:

If the statement is offered as substantive evidence for the truth of the matter asserted, the court must examine the statement

more closely and make a number of preliminary rulings. First, like all evidence, the statement must be relevant. In the context of state of mind evidence, the speaker's mindset must be pertinent to some contested issue in the legal proceeding. In criminal cases, the prosecution must prove the defendant's *mens rea* beyond a reasonable doubt. Thus, in the typical prosecution, a victim's state of mind simply is not relevant. There are exceptions to this general rule, including cases where the defendant has alleged self-defense, or where the defendant has challenged the manner of death[.] Prototypically, the latter exception occurs when the defendant argues that the victim died by accident or by suicide.

\*          \*          \*

[…I]f the statement is not a singular purpose statement, but instead contains both a state of mind component and a "fact-bound" component, it generally is inadmissible. The reasons rendering such statements inadmissible are patent, and compelling.

[…S]uch two-part statements are only relevant if they are taken for their truth. The problem is that there are two parts to these statements, only one of which facially is admissible: the state of mind component. The factual component is not. That part, which is uttered out-of-court and also offered for the truth of the matter asserted, does not satisfy this exception to the hearsay rule, nor does it possess the same hallmarks of reliability imputed to state of mind evidence. That one aspect of a statement is admissible does not render all of a multi-part statement admissible. Quite to the contrary, both components must independently be admissible. Each aspect of the statement must satisfy a hearsay exception.

[…T]he problem with admitting a statement into evidence where only a part of it is admissible [] allows the proponent of the evidence to bootstrap inadmissible hearsay into competent evidence. This permits a party to use the state of mind exception as a mechanism to circumvent the rules of evidence, repurposing state of mind evidence into a "conduit" to obtain admission of otherwise inadmissible facts.

*Id.* at 479–481 (citations omitted).

- 10 -

Additionally, with respect to Pa.R.E. 803(4),[5] the medical treatment

exception to the rule against hearsay, our Supreme Court has

> set forth the prevailing view that the identity of the assailant or perpetrator who may have caused the injury for which medical treatment is being sought, is not within the medical treatment exception because the identity of the abuser is not pertinent to medical treatment. While disclosing the events surrounding an injury may be important for medical treatment or diagnosis, identifying the person responsible for the injury is not medically necessary.

*Commonwealth v. Vining*, 744 A.2d 310, 319 (Pa. Super. 1999) ("In

*Commonwealth v. Smith*, 681 A.2d 1288 (Pa. 1996) our Supreme Court

refused to expand the scope of the medical treatment exception beyond its

relatively limited nature to include the identity of a perpetrator."); *see also*

*E.W. v. E.N.*, 327 A.3d 679, 692 (Pa. Super. 2024) ("It is well-established

that a statement identifying the individual who causes the injury that leads

the declarant to seek medical treatment may not be admitted under the Rule

803(4) exception.").

Based upon the foregoing law and our review of the certified record, we

conclude that the trial court erred in permitting all three of the statements at

issue to be presented at trial. First, there is no dispute that Victim did not

seek medical treatment or diagnosis in contemplation of treatment pursuant

---

[5] A statement made for medical diagnosis or treatment is "[a] statement that [] is made for – and is reasonably pertinent to – medical treatment or diagnosis in contemplation of treatment [and] describes medical history, past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to treatment, or diagnosis of treatment." Pa.R.E. 803(4).

Pa.R.E. 803(4). As such, for this reason alone, the medical treatment and diagnosis exception to hearsay is inapplicable instantly. Moreover, Victim told Ronald Jackson that she did not feel well but also testified that Victim "did a line of brown stuff in Appellant's truck" which identified Appellant as the person responsible for the injury. This latter statement was not medically necessary, and, therefore, Rule 803(4) is inapplicable for this additional reason.

Next, with regard to the then-existing state of mind exception to hearsay under Rule 803(3), each of Victim's statements at issue contemporaneously described her then-existing state of mind, more specifically, her physical condition relating to pain or her bodily health. By themselves, Victim's freestanding declarations to others that she did not feel well were entirely permissible. However, the challenged statements included "fact-bound" components, which were not independently admissible. It was error to permit Ronald Jackson to testify that Victim "did a line [of brown stuff] with [Appellant] in his truck" and Victim was "not sure what it was, but [thought] it was possibly heroin [when she thought] it was going to be cocaine, but it had a tint of brown so she wasn't sure." Trial Court Opinion, 8/7/2024, at 7-8. With regard to Patrick O'Hara, the trial court erred by permitting Patrick to testify that Victim said "don't use that. It's the wrong stuff. I think the bags got mixed up! Because [Appellant] had two bags. I think I did heroin." Trial Court Opinion, 8/7/2024, at 7; *see also* Appellant's Brief at 4-5. With regard to Floyd O'Hara, Patrick's father, the trial court

erroneously permitted Floyd to testify that Victim said, "the bags got mixed up" because "whatever she did in [Appellant's] car wasn't coke." Trial Court Opinion, 8/7/2024, at 7; *see also* Appellant's Brief at 5. In short, it was error for the trial court to allow the jury to consider, under the state of mind exception, Victim's factual recollections and statements of fear or confusion as to what substance she ingested. The Commonwealth should not have been permitted to bootstrap this inadmissible hearsay into competent evidence.[6] *See Fitzpatrick*, *supra*.

Our analysis, however, does not end there. After finding testimony inadmissible, our Supreme Court has stated that an appellate court must

> proceed to determine whether [the trial court's] erroneous admission nonetheless was harmless. *See Commonwealth v. Chmiel*, 889 A.2d 501, 521 (Pa. 2005) ("[A]n erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error was harmless.") (citation omitted). Our

---

[6] The trial court distinguished *Fitzpatrick* when it concluded that the challenged statements were admissible, noting that the hearsay declarations in *Fitzpatrick* related to future events while the statements here related to facts that had already occurred. *See* Trial Court Opinion, 3/6/25, at 4. This rationale is unavailing, as it finds no support in the text of Pa.R.E. 803(3), the attached comment, or the interpretive case law. A declarant's out-of-court statements reflecting his state of mind are admitted since they bear indicia of reliability at the time they are made. Here, however, Victim's uncertain recollections of the events surrounding her encounter with Appellant did not reflect her state of mind and do not fit within the paradigm of Rule 803(3). In addition, while the trial court and the parties appear to agree that Victim was a frequent cocaine user, nothing in the record supports the idea that she could accurately identify contraband simply by ingesting it. In fact, the record undermines this notion since it demonstrates that Victim twice ingested a controlled substance that she did not intend to use or acquire. In short, it was error for the trial court to overlook *Fitzpatrick* in assessing the admissibility of the challenged statements.

legal standards governing harmless error are well-settled. An error warrants relief "only if the appellate court is convinced beyond a reasonable doubt that the error is harmless." ***Commonwealth v. Story***, 383 A.2d 155, 162 (Pa. 1978). "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless." ***Id.*** at 164 (citation and internal quotation marks omitted). The Commonwealth bears the burden of proving that the error was harmless beyond a reasonable doubt. ***Id.*** at 162 n.11.

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

> ***Chmiel***, 889 A.2d at 521 (*quoting **Commonwealth v. Robinson***, 721 A.2d 344, 350 (Pa. 1998)).

***Fitzpatrick***, 255 A.3d at 483.

In this case, Appellant maintains that the errors in admitting the hearsay at issue were not harmless:

> Here, the prejudice to Appellant was not *de minimis*. There was no direct evidence that Appellant ever had any access to fentanyl laced substances, let alone that he delivered same to [V]ictim. The Commonwealth's case was based on weak circumstantial evidence, most of which was the hearsay that is challenged herein. When the jury heard that Appellant "mixed up the bags" and [V]ictim "did a line of something brown in [Appellant's] truck," Appellant's fate was sealed. They jury had nothing to base its verdict on other than circumstantial hearsay statements from which they were asked to infer that Appellant had anything to do with fentanyl.

- 14 -

Next, the erroneously admitted hearsay was not cumulative of other admissible evidence. There is no admissible evidence that Appellant "switched the bags" or that [V]ictim did [a] line of something brown with him in his truck.

Finally, the evidence was not overwhelming in this case. The lower court focused its analysis on this point by citing to the overwhelming evidence that Appellant delivered drugs to [V]ictim. But that point was not in dispute [as Victim sought to purchase cocaine from Appellant]. What was in dispute is whether Appellant ever actually possessed fentanyl and delivered it to [V]ictim. The only evidence that a jury could infer these facts from was the hearsay that the lower court improperly allowed the Commonwealth to elicit. Thus, the lower court's assertion that this case can be disposed of on harmless error grounds should be rejected.

Appellant's Brief at 12-13.[7]

The offense of drug delivery resulting in death is defined as follows:

**(a) Offense defined.**--A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of [S]ection 13(a)(14) or (30) of the [A]ct of April 14, 1972 (P.L. 233, No. 64),1 known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a) (footnote omitted).

---

[7]  Initially, we note that, in his harmless error analysis, Appellant does not challenge his conviction for recklessly endangering another person and he concedes that he delivered drugs to Victim, which supports his three convictions for possession with intent to deliver narcotics. Therefore, we confine our analysis regarding Appellant's harmless error claim to only his convictions for drug delivery resulting in death and involuntary manslaughter. *See* Appellant's Brief at 4 ("The issue at trial was not whether Appellant and [Victim] had exchanged drugs. Rather, it appeared that [Victim] was a frequent drug user and seller, the issue to be resolved by the jury [was] whether the Commonwealth could prove beyond a reasonable doubt that Appellant is the person who delivered the fatal substance to [Victim].").

"The crime ... consists of two principal elements: (i) [i]ntentionally administering, dispensing, delivering, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance and (ii) death caused by ('resulting from') the use of that drug." **Commonwealth v. Proctor**, 156 A.3d 261, 268 (Pa. Super. 2017) (footnote omitted), *citing* **Commonwealth v. Kakhankham**, 132 A.3d 986, 991-992 (Pa. Super. 2015).

> To establish drug delivery resulting in death,
>
> > the Commonwealth need not prove that the defendant intended to cause the death of another. **See Commonwealth v. Kakhankham**, 132 A.3d 986, 993 (Pa. Super. 2015). Instead, the Commonwealth must establish that the defendant's act of administering, dispensing, delivering, giving, prescribing, selling, or distributing the substance was intentional and that the defendant had a "reckless disregard of death from the use of the contraband." **Commonwealth v. Carr**, 227 A.3d 11, 17 (Pa. Super. 2020). A defendant acts recklessly when he
> >
> > > consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
> >
> > 18 Pa.C.S.A. § 302(b)(3). Given the inherent dangerousness of consuming fentanyl in an unknown strength and the high possibility that death could occur, the Commonwealth "satisfies the reckless element as to the possibility of death" when the substance involved is fentanyl. **See Commonwealth v. Storey**, 167 A.3d 750, 758 (Pa. Super. 2017) (holding that the intentional sale of heroin to a person, the use of which caused the death of a third person unknown to the defendant, constitutes recklessness for the purpose of DDRD). The statute requires "but-for" causation such that the defendant's action with the drugs was a

"direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result," so long as the defendant's actions were not "so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." **Commonwealth v. Proctor**, 156 A.3d 261, 271 (Pa. Super. 2017); **see also** 18 Pa.C.S.A. § 303(a).

**Commonwealth v. Scott**, 325 A.3d 844, 850 (Pa. Super. 2024).

The Commonwealth may offer expert testimony "that notwithstanding other drugs in [a victim's] system," the amount of the lethal narcotic ingested by the victim was, in fact, the cause of death. **See Proctor**, 156 A.3d at 268, *citing* N.T., 9/29-30/2015, at 348-350 (Kevin Dusenbury, Sr., coroner of Potter County, explaining that "[t]he level of the [h]eroin[ ] metabolite was a lethal level" and, when asked whether "[h]eroin[ ] in and of itself when you inject it is not lethal, correct?," answering, "It was in this case I believe.").

"A person is guilty of involuntary manslaughter when[,] as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a).

Crimes arising from a single criminal act merge where all of the statutory elements of one offense are included in the statutory elements of the other offense. **See** 42 Pa.C.S.A. § 9765. Here, drug delivery resulting in death is an intentional act and requires a violation of the Controlled Substances Act; whereas, involuntary manslaughter only requires reckless conduct and does not require a violation of the Controlled Substances Act. As such, it is possible to commit involuntary manslaughter without committing drug delivery resulting in death. However, in this case, because Appellant is challenging the

- 17 -

causation of Victim's death in the context of harmless error, our resolution of the harmless error issue will address both convictions.

Here, the trial court determined that any error in admitting the three statements at issue was harmless:

> In the current case an extensive Snapchat text exchange between [Appellant] and [V]ictim was introduced at trial[, the Snapchat texts were admitted without objection, and their admission is not questioned on appeal]. These texts demonstrate that [Appellant] contacted [V]ictim shortly before her death and encouraged her to "find someone to buy 3 G's." Further, he texts [V]ictim, who he knows is a drug user: "I'll give you two grams free and clear. I just need to make $300[.00] more before I can get more. And I can let you … I can let whoever take a sample to try a bump before they buy." [Appellant] described the drugs he was asking [V]ictim to purchase as "quality and not some horse shit." Further, Snapchat messages [we]re also admitted between [V]ictim and an individual she intend[ed] to [sell] the drugs to, Patrick O'Hara. [Patrick] asks about the quality of the drugs to be provided as it [was] "way cheap;" and, [V]ictim responds[,] "let me know if you want to try it with me." There are also text messages between [Appellant] and [V]ictim setting up a place and time for them to meet. Included in this exchange [was] a text from [Appellant] to [V]ictim: "I'm almost done, but I'll drop by so you can try it, alright?" [V]ictim responded: "sounds good." After [Appellant] texted [V]ictim "here," [Victim] texted [Appellant:] "Yo that shit is good for real, try saving" and she texted "fire emojis" to [Patrick]. [Appellant] also texted [V]ictim, "**And, I'm sorry I couldn't give you more to try. It's not a huge amount that's going to get you super zooted**." The Commonwealth also admitted and played video surveillance footage of [Appellant] and [V]ictim in his vehicle. [Appellant] called the Bradford Police the day that [V]ictim's body was discovered and admitted that he had met her the day before in his vehicle.
>
> [...T]he video footage that shows [V]ictim getting in [Appellant's] vehicle [] coincides with the text messages [coupled with Appellant's] admission that he met with [V]ictim in his vehicle, strongly support[s] a finding that [Appellant] was selling drugs, encouraged [V]ictim to try them, which she did, and the use of

the drugs that [Appellant] provided and described as "quality and not some horse shit," which would "get [her] super zooted," killed her.

Trial Court Opinion, 3/6/2025, at 6-8 (footnote incorporated; emphasis in original; record citations omitted).[8]

We agree with the trial court's assessment. Here, the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. First, there is no dispute that, on the night in question, Appellant and Victim met twice in order for Victim to sample and procure narcotics from Appellant. Video surveillance, text and Snapchat messages, and trial testimony established that Victim got into Appellant's vehicle each time. Important to the current appeal, the Commonwealth entered all of the digital communications between Appellant and Victim, on the evening in question, into evidence at trial. Appellant offered to give Victim a sample of the drugs in his possession, so that she could sell those narcotics to others. *See* N.T., 8/20/2024, at 92 ("If you can find someone to buy 3 G's, I'll give you 2 grams free and clear. I just need to make $300[.00] before I can get more. And I can let you – I can let whoever – take a sample to try a

---

[8] The trial court made a similar pre-trial ruling. ***See also*** Trial Court Opinion, 8/7/2024, at 9 ("Further, any prejudice to [Appellant] from the admission of these statements would be minimal. As outlined above, the Snapchat communications between [Victim] and [Appellant], and communications between Patrick O'Hara and [Victim were] already held admissible. They outline in detail the plan for the drug exchange and [Victim's] use of some of them. Further, [Appellant] stated to [police] that he had arranged to provide drugs to [Victim]. Therefore, there is already evidence, separate from [Victim's statements], that she obtained drugs from [Appellant].").

bump and try before they buy.  So that [] way they will know they're getting quality and not some horse shit."); *id.* at 93 ("So, if you scratch my back, I'll scratch yours.  It's definitely good work, for real.  I wouldn't try to sell garbage, that's for damn sure.").  After meeting Victim for the first time, and allowing her to sample his narcotics, Appellant touted the potent strength of the narcotics he had just delivered to Victim.  *See id.* at 99 ("And I'm sorry that I couldn't give you more to try.  It's not a huge amount that's going to get you super zooted.  But trust me, the people I've been doing it with since I got to town [] all had good reviews about it.").  When Victim text messaged Appellant 40 minutes later, she declared, "holy shit I'm sweating." *Id.* at 100. Appellant replied, "haha, yeah, last night I almost got sick after a few decent bumps. Wait till you bust a real line.  It's going to be way tastier and you'll just get actually zooted."  *Id.*; *see also id.* at 105 (Victim to Appellant: "[W]ith how good it is, it's not like you need a shit ton."  Appellant to Victim: "[Y]eah, that's what [I was] talking about last night.  Like, it's good enough to do a little bit and not have a terrible comedown.  Like, it's just so satisfying, I don't know.  Like, you want more, but it's not such a shitty comedown when it's good, the high feels cleaner when it's not cut with a bunch of horse shit.").

The Commonwealth also presented the testimony of Dr. Stephanie Marco, a forensic toxicologist, to testify about the narcotics found in Victim's bloodstream post-mortem.  *Id.* at 26-47.  Tests confirmed the presence of "Benzoylecgonine, … the metabolite of Cocaine.  Cocaine was also present. Amphetamine, Methamphetamine, Fentanyl, and Norfentanyl, which is

Fentanyl's metabolite." *Id.* at 34. Victim had 11 nanograms per milliliter of Fentanyl in her system. *Id.* at 34, 36, and 43. Dr. Marco stated that she had "seen fatalities as low as three nanograms per milliliter from Fentanyl." *Id.* at 36. Victim had more than three times that amount in her bloodstream. Dr. Marco further opined that cocaine did not kill Victim and confirmed that fentanyl was the cause of death. *Id.* at 46-47. In conjunction, the Commonwealth also presented the testimony of Dr. Eric Vey, the forensic pathologist who performed the Victim's autopsy. He opined that "[c]ombined toxicity predominantly involving Fentanyl" was Victim's cause of death. *Id.* at 63-64. Dr. Vey confirmed Dr. Marco's findings that cocaine and/or methamphetamine did not kill Victim. *Id.* at 63. Instead, Dr. Vey also opined that the fentanyl found in Victim's bloodstream "was at 11 nanograms per ml[,] the lower lethal threshold from autopsy samples in Fentanyl deaths starts at 3 [nanograms … while t]he average lethal level found in autopsy specimens is 8." *Id.* As such, Dr. Vey pointed out that Victim's blood contained "three and a half times" more fentanyl than the lower-level fatal threshold and it was "unlikely that death would have occurred from the Cocaine or Amphetamine at all." *Id.* at 63-64.

Finally, we note that the Commonwealth presented the testimony of multiple witnesses who saw Victim, before and after meeting with Appellant on two separate occasions on the same day, and noted and described her

state of intoxication[9] and the drastic change in her demeanor both times.

Moreover, as previously discussed above, the Commonwealth also permissibly

_____

[9] We have previously determined:

> Intoxication is a matter of common knowledge, and opinions given by lay people are permissible on the issue. ***Commonwealth v. Reynolds***, 389 A.2d 1113 (Pa. Super. 1978). However, the lay witness must have sufficient facts on which to base his opinion before he can express an opinion on another's intoxication. ***Commonwealth v. Hughes***, 389 A.2d 1081 (Pa. 1978). ***See also Commonwealth v. Summers***, 410 A.2d 336 (Pa. Super. 1979) (court concludes witness' observations of the way the person looked and the way he was walking provided sufficient factual basis for witness to conclude a person was intoxicated). The court also looks to the witness' personal knowledge and observation. ***Commonwealth v. Davenport***, 386 A.2d 543 (Pa. Super. 1978).

***Commonwealth v. Womack***, 453 A.2d 642, 648 (Pa. Super. 1982). In addition, we note that lay opinion testimony embracing an ultimate issue in a case is admissible as long as the witness perceived the events upon which his opinion is based.

***Commonwealth v. Bowser***, 624 A.2d 125, 133 (Pa. Super. 1993); ***see also Commonwealth v. Horn***, 150 A.2d 872, 875 (Pa. 1959) (citation omitted) ("Intoxication is a matter of common observation and knowledge, and because of observation, knowledge or experience, the opinions of laymen are admissible and medical opinion, while of course admissible, is not required."); ***see also Commonwealth v. McLaughlin***, 198 A.2d 419, 421 (Pa. Super. 1964) (citations omitted) ("Intoxication is a matter of common observation on which the opinions of non-experts are generally admissible [but t]he testimony of a physician is not required."). More specifically, we previously determined that "the intoxicating effects of cocaine and opiates, like the intoxicating effects of alcohol, are more widely and commonly understood than the effects of prescription medication." ***Commonwealth v. DiPanfilo***, 993 A.2d 1262, 1267 (Pa. Super. 2010). Furthermore, this Court has found "no basis upon which to distinguish opinion

*(Footnote Continued Next Page)*

- 22 -

entered evidence into the trial record regarding Victim's statements to others that she felt ill. For example, Patrick O'Hara testified that before he met with Appellant, Victim was "her normal self, upbeat, happy. Glad to see [Patrick] and just seemed like herself and she looked good at that point." N.T., 8/19/2024, at 201. When Victim returned, Patrick saw "a clump of white stuff in her nostril." *Id.* at 203. Victim handed Patrick a bag of narcotics. *Id.* at 202. Patrick testified that Victim's demeanor had changed, "she wasn't very talkative and she had become very … hot and sweaty" and "there was something off at that point." *Id.* When Patrick went into his house to get money, Victim "came into the house and she told [Patrick] -- in front of [his] dad …. that she didn't want [Patrick] to [use the narcotics] in the bag because she had just [done] a line of something that never made her feel that way and she [knew] it wasn't cocaine." *Id.* at 203; *see also id.* at 204 ("She said, I don't feel right and I've never done a line of cocaine that made me feel this way."); *see also id.* at 217 ("But when she first came in, there was nothing calm about it, no. There was something wrong."). Despite the warning, Patrick used the narcotics Appellant gave Victim and he became "clammy and hot," vomited, and "start[ed] to nod out as [he] sat there" which he had not

---

testimony of drug-induced intoxication from opinion testimony of alcohol-induced intoxication where the witness is personally familiar with the effects of narcotics." *Commonwealth v. Yedinak*, 676 A.2d 1217, 1221 (Pa. Super. 1996) (citations omitted).

*Commonwealth v. Kearns*, 332 A.3d 1267 (Pa. Super. 2024) (non-precedential decision).

experienced before as a regular cocaine user who believed he was ingesting cocaine. *Id.* at 206. Thereafter, Patrick discarded the narcotics. Later, Patrick text messaged Victim "to make sure she was okay" because of "the way [he] felt" and because he was concerned he "disrespected her [when he] didn't listen to her when she said not to [use the narcotics] but [Patrick] did it" anyway. *Id.* at 207. Victim never responded. *Id.*

Patrick's father, Floyd O'Hara, testified that Victim came into his house and told his son not to use narcotics she had just given him because she "got sick in the car and [did not] feel well." *Id.* at 220. Floyd asked Victim "a couple of times" if "she wanted to go to the hospital" "[b]ecause she got sick in the driveway and she said she never got sick before doing [cocaine. …] The girl knew something was up." *Id.* at 220-221. Victim calmed down but needed physical assistance going down the stairs when leaving. *Id.* at 221.

A short time later, Victim met Ronald Jackson at the Keystone Bar. *Id.* at 242. Victim ordered a drink but left shortly thereafter telling the bartender, Tiffany Teeter, that she "had to go somewhere" and would be right back. *Id.* at 243. Video surveillance and text messages showed that Victim met Appellant in his truck for the second time that day. When Victim returned to the bar, she went straight to the women's bathroom, where Teeter later found her sitting on the floor. *Id.* at 243; *see also id.* at 249 ("She was sitting on the floor with her back up against the wall. … She was sick. You could tell that she had already vomited. And she did state[,] I'm just not feeling good.").

When Victim returned to the bar area, Teeter testified to the following interactions:

[Teeter] took [Victim's] drink away[,] got a couple of bottles of water[, and] talked to her. [Teeter] asked her, … are you okay? [Victim] said, I don't know, I don't think so. [Teeter] said, do I need… to call 911? [Victim] said, you can't do that. [Teeter] asked her what she did, because … you could tell. She had no pupils [and] she was sweating profusely. [Victim said she thought she ingested "H" which Teeter understood to mean heroin.]

* * *

[Teeter] then said, "listen, we need to call 911. You need medical treatment." [Victim] panicked, she said no, she would leave. And then she told Ronnie that she needed to go to sleep. Ronnie said, nope, I don't think that's a good idea. We pondered on what to do. And, I said, listen, Ronnie, she needs to go. She needs to go to the hospital. She needs 911.

N.T., 8/19/2024, at 243-244; *see also id.* at 247 ("[Victim] just started stuttering, talking real fast, saying she was just going to leave, she was just going to go home, she was just going to leave. And we tried not to let her just go anywhere, didn't want her to just leave. [Teeter, a trained nurse,] knew [Victim] needed medical attention, but … also [knew Victim] ha[d] the right to refuse medical treatment.").

Ronald Jackson testified similarly. *See* N.T., 8/20/2024, at 11-12 ("She was sweating quite bad … and went into the bathroom and she was in there quite a while. She was getting sick. When she [came] out … I sat her down, went and got her a glass of water, and that's when Tiffany came over and we were asking her what was wrong[.]"); *id.* at 13 ("She's just real sweaty and

- 25 -

nodding and said she was just tired and didn't feel good. …. When I asked her if she wanted me to call her mom or an ambulance, she said no.").

Finally, we note that Dr. Marco testified that "sometimes there is a delay in death. So, depending on when someone used a substance, it takes a certain period of time to cause its effects on the body. …[It] really does depend on the individual, their tolerance, as well as what other drugs may be present" for determining metabolization. N.T., 8/20/2024, at 44. Postulating that if Victim "had taken the drug [at] 11:30 p.m. and the EMS was called after noticeable gurgling around 6:00 a.m.[,]" Dr. Vey testified that the timing of events

> [were] entirely in keeping [with and] totally consistent with a drug overdose death. [] Fentanyl is a synthetic opioid. It's about 10 times more powerful than Morphine. It causes respiratory depression, lethargy, somnolence, and you slip into a coma. And typically, as these individuals succumb from respiratory insufficiency due to central nervous depression from the drug affecting the brain stem, they will typically get into pulmonary edema and start having gurgling respirations during their phase of demise.

*Id.* at 65. As such, the Commonwealth produced evidence that drug overdose deaths may be delayed in order to explain why Victim did not succumb immediately after imbibing narcotics with Appellant.

Here, based upon all of the foregoing, we agree with the trial court that it was reasonable for the jury to infer that the fentanyl that was found in Victim's system was from the narcotics delivered by Appellant, and that Victim died from ingesting them. Taken all together, the text messages and video surveillance, witness testimony pertaining to Victim's intoxication and physical

demeanor, Victim's statements that she felt ill after ingesting the narcotics delivered by Appellant, Patrick O'Hara's confirmation that the drugs made him ill as well, and the toxicology reports and expert testimony confirming the fatal level of fentanyl in Victim's blood all support Appellant's convictions for involuntary manslaughter and drug delivery resulting in death. The Commonwealth did not need to prove that Appellant intended to cause Victim's death. Instead, the Commonwealth was required to establish that Appellant's act of delivering the drugs was intentional. **See Scott**, **supra**. In this case, there is no dispute that Appellant intentionally delivered narcotics to Victim. Thereafter, the Commonwealth needed only to show that Appellant had a reckless disregard of death from Victim's use of the contraband. **Id.**

Upon review, the Commonwealth met its burden. Appellant recklessly disregarded death as a result of Victim's use of this specific narcotic, known and touted by Appellant as extremely potent and powerful with the ability to get one "super zooted." Moreover, Appellant, himself, admitted that the narcotic was so strong it made him ill after he ingested it. Toxicology confirmed Victim ingested more than three times the lethal amount of fentanyl. Multiple eyewitnesses testified that Victim was so intoxicated that they believed she required hospitalization. Accordingly, while the trial court erred as a matter of law by admitting the three hearsay statements at issue, the errors were harmless in light of the additional, overwhelming admissible evidence presented by the Commonwealth as set forth in detail above. That evidence allowed the jury to infer, beyond a reasonable doubt, that Appellant

- 27 -

delivered to Victim a controlled substance which caused or contributed to her death.  Accordingly, Appellant's sole appellate issue does not merit relief.

Judgment of sentence affirmed.


Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 06/08/2026